## In re the WALT DISNEY COMPANY DERIVATIVE LITIGATION.

**William Brehm and Geraldine Brehm, as Trustees and Custodians; Michael Grening; Richard Kaplan and David Kaplan, as Trustees; Thomas M. Malloy; Richard J. Kager and Carol R. Kager, as Joint Tenants; Michael Caesar, as Trustee for Howard Gunty, Inc. Profit Sharing Plan; Robert S.**

---

Goldberg, I.R.A.; Michael Shore; Michele DeBendictis; Peter Lawrence, I.R.A.; Melvin Zupnick; Judith B. Wohl, I.R.A. James C. Hays; and Barnett Stepak, Plaintiffs Below, Appellants,

v.

Michael D. Eisner, Michael S. Ovitz, Stephen F. Bollenbach, Sanford M. Litvack, Irwin Russell, Roy E. Disney, Stanley P. Gold, Richard A. Nunis, Sidney Poitier, Robert A.M. Stern, E. Cardon Walker, Raymond L. Watson, Gary L. Wilson, Reveta F. Bowers, Ignacio E. Lozano Jr., George J. Mitchell, Leo J. O'Donovan, Thomas S. Murphy and The Walt Disney Company, Defendants Below, Appellees.

No. 411, 2005.

Supreme Court of Delaware.

Submitted: Jan. 25, 2006.

Decided: June 8, 2006.

Joseph A. Rosenthal and Norman M. Monhait, Esquires, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Seth D. Rigrodsky, Esquire, of Milberg Weiss Bershad & Schulman LLP, Wilmington, Delaware; Of Counsel: Steven G. Schulman (argued), Joshua H. Vinik, Jennifer K. Hirsh, John B. Rediker and Laura H. Gundersheim, Esquires, of Milberg Weiss Bershad & Schulman LLP, New York, New York; for Appellants.

Lawrence C. Ashby, Richard D. Heins and Philip Trainer, Jr., Esquires, of Ashby & Geddes, P.A., Wilmington, Delaware; Of Counsel: Gary P. Naftalis (argued), Michael S. Oberman, Paul H. Schoeman and Shoshana Menu, Esquires, of Kramer Levin Naftalis & Frankel, LLP, New York, New York; for Appellee Eisner.

David C. McBride and Christian Douglas Wright, Esquires, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Of Counsel: Mark H. Epstein (argued), Bart H. Williams and Jason L. Haas, Esquires, of Munger, Tolles & Olson LLP, Los Angeles, California; for Appellee Ovitz.

Jesse A. Finkelstein, Gregory P. Williams (argued), Anne C. Foster, Lisa A. Schmidt, Evan O. Williford, and Michael R. Robinson, Esquires, of Richards, Layton & Finger, P.A., Wilmington, Delaware;

for Appellees Bollenbach, Russell, Nunis, Poitier, Stern, Walker, Watson, Wilson, Bowers, Lozano, Mitchell, O'Donovan, and Murphy.

Robert K. Payson, Stephen C. Norman and Kevin R. Shannon, Esquires, of Potter Anderson & Corroon LLP, Wilmington, Delaware; for Appellee Litvack.

A. Gilchrist Sparks, III and S. Mark Hurd, Esquires, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Stephen D. Alexander and Susan C. Chun, Esquires, of Bingham McCutchen LLP, Los Angeles, California; for Appellees Disney and Gold.

Andre G. Bouchard and Joel Friedlander, Esquires, of Bouchard Margules & Friedlander, Wilmington, Delaware; for Appellee The Walt Disney Company.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice.

In August 1995, Michael Ovitz ("Ovitz") and The Walt Disney Company ("Disney" or the "Company") entered into an employment agreement under which Ovitz would serve as President of Disney for five years. In December 1996, only fourteen months after he commenced employment, Ovitz was terminated without cause, re-sulting in a severance payout to Ovitz valued at approximately $130 million.

In January 1997, several Disney shareholders brought derivative actions in the Court of Chancery, on behalf of Disney, against Ovitz and the directors of Disney who served at the time of the events complained of (the "Disney defendants"). The plaintiffs claimed that the $130 million severance payout was the product of fiduciary duty and contractual breaches by Ovitz, and breaches of fiduciary duty by the Disney defendants, and a waste of assets. After the disposition of several pretrial motions and an appeal to this Court,[1] the case was tried before the Chancellor over 37 days between October 20, 2004 and January 19, 2005. In August 2005, the Chancellor handed down a well-crafted 174 page Opinion and Order, determining that "the director defendants did not breach their fiduciary duties or commit waste."[2] The Court entered judgment in favor of all defendants on all claims alleged in the amended complaint.

The plaintiffs have appealed from that judgment, claiming that the Court of Chancery committed multitudinous errors. We conclude, for the reasons that follow, that the Chancellor's factual findings and legal rulings were correct and not erroneous in any respect. Accordingly, the judg-

---

1. The Court of Chancery dismissed the original complaint in 2000. *In re The Walt Disney Co. Derivative Litig.*, 731 A.2d 342 (Del. Ch.1998). On appeal, this Court affirmed the dismissal in part and reversed it in part, remanding the case to the Court of Chancery and granting the plaintiffs leave to replead. *Brehm v. Eisner*, 746 A.2d 244 (Del.2000). The plaintiffs filed their second amended complaint in January 2002, and in May 2003, the Court of Chancery denied the defendants' motion to dismiss that complaint, ruling that a complete factual record was needed to determine whether the defendant directors had breached their fiduciary duties. *In re The Walt Disney Co. Derivative Litig.*, 825 A.2d 275 (Del.Ch.2003). After extensive discovery Ovitz moved for summary judgment. That motion was granted in part and denied in part in September 2004. *In re Walt Disney Co. Derivative Litig.*, 2004 WL 2050138 (Del.Ch. Sept.10, 2004). Thereafter, the case was scheduled for trial.

2. *In re The Walt Disney Company Derivative Litig.*, 2005 WL 2056651, at * 1 (Del. Ch. Aug. 9, 2005); 907 A.2d 693 (Del.2005) (cited throughout this Opinion as "Post-trial Op.").

ment entered by the Court of Chancery will be affirmed.

## I. *THE FACTS*

We next summarize the facts as found by the Court of Chancery that are material to the issues presented on this appeal.[3] The critical events flow from what turned out to be an unfortunate hiring decision at Disney, a company that for over half a century has been one of America's leading film and entertainment enterprises.

In 1994 Disney lost in a tragic helicopter crash its President and Chief Operating Officer, Frank Wells, who together with Michael Eisner, Disney's Chairman and Chief Executive Officer, had enjoyed remarkable success at the Company's helm. Eisner temporarily assumed Disney's presidency, but only three months later, heart disease required Eisner to undergo quadruple bypass surgery. Those two events persuaded Eisner and Disney's board of directors that the time had come to identify a successor to Eisner.

Eisner's prime candidate for the position was Michael Ovitz, who was the leading partner and one of the founders of Creative Artists Agency ("CAA"), the premier talent agency whose business model had reshaped the entire industry. By 1995, CAA had 550 employees and a roster of about 1400 of Hollywood's top actors, directors, writers, and musicians. That roster generated about $150 million in annual revenues and an annual income of over $20 million for Ovitz, who was regarded as one of the most powerful figures in Hollywood.

Eisner and Ovitz had enjoyed a social and professional relationship that spanned nearly 25 years. Although in the past the two men had casually discussed possibly working together, in 1995, when Ovitz began negotiations to leave CAA and join Music Corporation of America ("MCA"), Eisner became seriously interested in recruiting Ovitz to join Disney. Eisner shared that desire with Disney's board members on an individual basis.[4]

### A. *Negotiation Of The Ovitz Employment Agreement*

Eisner and Irwin Russell, who was a Disney director and chairman of the compensation committee, first approached Ovitz about joining Disney. Their initial negotiations were unproductive, however, because at that time MCA had made Ovitz an offer that Disney could not match. The MCA–Ovitz negotiations eventually fell apart, and Ovitz returned to CAA in mid–1995. Business continued as usual, until Ovitz discovered that Ron Meyer, his close friend and the number two executive at CAA, was leaving CAA to join MCA. That news devastated Ovitz, who concluded that to remain with the company he and Meyer had built together was no longer palatable. At that point Ovitz became receptive to the idea of joining Disney. Eisner learned of these develop-

---

**3.** The facts recited herein are a skeletal summary of over 100 pages of factual findings contained in the Court of Chancery's Posttrial Opinion, *supra* at note 2. Except where noted, those findings are uncontroverted.

**4.** The Disney board of directors at that time and at the time the Ovitz Employment Agreement was approved (the "old board") consisted of Eisner, Roy E. Disney, Stanley P. Gold, Sanford M. Litvack, Richard A. Nunis, Sidney Poitier, Irwin E. Russell, Robert A.M. Stern,

E. Cardon Walker, Raymond L. Watson, Gary L. Wilson, Reveta F. Bowers, Ignacio E. Lozano, Jr., George J. Mitchell, and Stephen F. Bollenbach. The board of directors at the time Ovitz was terminated as President of Disney (the "new board") consisted of the persons listed above (other than Bollenbach), plus Leo J. O'Donovan and Thomas S. Murphy. Neither O'Donovan nor Murphy served on the old board.

ments and re-commenced negotiations with Ovitz in earnest. By mid-July 1995, those negotiations were in full swing.

Both Russell and Eisner negotiated with Ovitz, over separate issues and concerns. From his talks with Eisner, Ovitz gathered that Disney needed his skills and experience to remedy Disney's current weaknesses, which Ovitz identified as poor talent relationships and stagnant foreign growth. Seeking assurances from Eisner that Ovitz's vision for Disney was shared, at some point during the negotiations Ovitz came to believe that he and Eisner would run Disney, and would work together in a relation akin to that of junior and senior partner. Unfortunately, Ovitz's belief was mistaken, as Eisner had a radically different view of what their respective roles at Disney should be.

Russell assumed the lead in negotiating the financial terms of the Ovitz employment contract. In the course of negotiations, Russell learned from Ovitz's attorney, Bob Goldman, that Ovitz owned 55% of CAA and earned approximately $20 to $25 million a year from that company. From the beginning Ovitz made it clear that he would not give up his 55% interest in CAA without "downside protection." Considerable negotiation then ensued over downside protection issues. During the summer of 1995, the parties agreed to a draft version of Ovitz's employment agreement (the "OEA") modeled after Eisner's and the late Mr. Wells' employment contracts. As described by the Chancellor, the draft agreement included the following terms:

> Under the proposed OEA, Ovitz would receive a five-year contract with two tranches of options. The first tranche consisted of three million options vesting in equal parts in the third, fourth,

and fifth years, and if the value of those options at the end of the five years had not appreciated to $50 million, Disney would make up the difference. The second tranche consisted of two million options that would vest immediately if Disney and Ovitz opted to renew the contract.

The proposed OEA sought to protect both parties in the event that Ovitz's employment ended prematurely, and provided that absent defined causes, neither party could terminate the agreement without penalty. If Ovitz, for example, walked away, for any reason other than those permitted under the OEA, he would forfeit any benefits remaining under the OEA and could be enjoined from working for a competitor. Likewise, if Disney fired Ovitz for any reason other than gross negligence or malfeasance, Ovitz would be entitled to a non-fault payment (Non–Fault Termination or "NFT"), which consisted of his remaining salary, $7.5 million a year for unaccrued bonuses, the immediate vesting of his first tranche of options and a $10 million cash out payment for the second tranche of options.[5]

As the basic terms of the OEA were crystallizing, Russell prepared and gave Ovitz and Eisner a "case study" to explain those terms. In that study, Russell also expressed his concern that the negotiated terms represented an extraordinary level of executive compensation. Russell acknowledged, however, that Ovitz was an "exceptional corporate executive" and "highly successful and unique entrepreneur" who merited "downside protection and upside opportunity."[6] Both would be required to enable Ovitz to adjust to the reduced cash compensation he would re-

---

**5.** Post-trial Op. at ——, *6 (footnote omitted). **6.** *Id.*

ceive from a public company, in contrast to the greater cash distributions and other perquisites more typically available from a privately held business. But, Russell did caution that Ovitz's salary would be at the top level for any corporate officer and significantly above that of the Disney CEO. Moreover, the stock options granted under the OEA would exceed the standards applied within Disney and corporate America and would "raise very strong criticism." [7] Russell shared this original case study only with Eisner and Ovitz. He also recommended another, additional study of this issue.

To assist in evaluating the financial terms of the OEA, Russell recruited Graef Crystal, an executive compensation consultant, and Raymond Watson, a member of Disney's compensation committee and a past Disney board chairman who had helped structure Wells' and Eisner's compensation packages. Before the three met, Crystal prepared a comprehensive executive compensation database to accept various inputs and to conduct Black–Scholes analyses to output a range of values for the options.[8] Watson also prepared similar computations on spreadsheets, but without using the Black–Scholes method.

On August 10, Russell, Watson and Crystal met. They discussed and generated a set of values using different and various inputs and assumptions, accounting for different numbers of options, vesting periods, and potential proceeds of option exercises at various times and prices. After discussing their conclusions, they agreed that Crystal would memorialize his findings and fax them to Russell. Two days later, Crystal faxed to Russell a memorandum concluding that the OEA would provide Ovitz with approximately $23.6 million per year for the first five years, or $23.9 million a year over seven years if Ovitz exercised a two year renewal option.[9] Those sums, Crystal opined, would approximate Ovitz's current annual compensation at CAA.

During a telephone conference that same evening, Russell, Watson and Crystal discussed Crystal's memorandum and its assumptions. Their discussion generated additional questions that prompted Russell to ask Crystal to revise his memorandum to resolve certain ambiguities in the current draft of the employment agreement. But, rather than address the points Russell highlighted, Crystal faxed to Russell a new letter that expressed Crystal's concern about the OEA's $50 million option appreciation guarantee. Crystal's concern, based on his understanding of the current draft of the OEA, was that Ovitz could hold the first tranche of options, wait out the five-year term, collect the $50 million guarantee, and then exercise the in-the-money options and receive an additional windfall. Crystal was philosophically opposed to a pay package that would give Ovitz the best of both worlds—low risk and high return.

Addressing Crystal's concerns, Russell made clear that the guarantee would not function as Crystal believed it might. Crystal then revised his original letter, adjusting the value of the OEA (assuming a two year renewal) to $24.1 million per year. Up to that point, only three Disney directors—Eisner, Russell and Watson—

---

7. *Id.*

8. The Black–Scholes method is a formula for option valuation that is widely used and accepted in the industry and by regulators.

9. In a later, revised memorandum, Crystal estimated that the two additional years would increase the value of the entire OEA to $24.1 million per year.

knew the status of the negotiations with Ovitz and the terms of the draft OEA.

While Russell, Watson and Crystal were finalizing their analysis of the OEA, Eisner and Ovitz reached a separate agreement. Eisner told Ovitz that: (1) the number of options would be reduced from a single grant of five million to two separate grants, the first being three million options for the first five years and the second consisting of two million more options if the contract was renewed; and (2) Ovitz would join Disney only as President, not as a co-CEO with Eisner. After deliberating, Ovitz accepted those terms, and that evening Ovitz, Eisner, Sid Bass[10] and their families celebrated Ovitz's decision to join Disney.

Unfortunately, the celebratory mood was premature. The next day, August 13, Eisner met with Ovitz, Russell, Sanford Litvack (an Executive Vice President and Disney's General Counsel), and Stephen Bollenbach (Disney's Chief Financial Officer) to discuss the decision to hire Ovitz. Litvack and Bollenbach were unhappy with that decision, and voiced concerns that Ovitz would disrupt the cohesion that existed between Eisner, Litvack and Bollenbach. Litvack and Bollenbach were emphatic that they would not report to Ovitz, but would continue to report to Eisner.[11] Despite Ovitz's concern about his "shrinking authority" as Disney's future President, Eisner was able to provide sufficient reassurance so that ultimately Ovitz acceded to Litvack's and Bollenbach's terms.

■ On August 14, Eisner and Ovitz signed a letter agreement (the "OLA"), which outlined the basic terms of Ovitz's employment, and stated that the agreement (which would ultimately be embodied in a formal contract) was subject to approval by Disney's compensation committee and board of directors. Russell called Sidney Poitier, a Disney director and compensation committee member, to inform Poitier of the OLA and its terms. Poitier believed that hiring Ovitz was a good idea because of Ovitz's reputation and experience. Watson called Ignacio Lozano, another Disney director and compensation committee member, who felt that Ovitz would successfully adapt from a private company environment to Disney's public company culture. Eisner also contacted each of the other board members by phone to inform them of the impending new hire, and to explain his friendship with Ovitz and Ovitz's qualifications.[12]

10. Sid Bass was one of Disney's largest individual shareholders.

11. In its Opinion, the Court of Chancery was skeptical of Litvack's and Bollenbach's stated reasons for not wanting to report to Ovitz. The Court perceived that Litvack's resistance to Ovitz stemmed in part from his resentment at not being selected to be Disney's President, a post he coveted; and that Bollenbach's emphasis on the importance of being part of a cohesive trio was "disingenuous," since Bollenbach had been with the Company for only three months before learning of the Ovitz negotiations. Post-trial Op. at ——, *8.

12. The appellants contend the trial court erred in finding that Eisner had made phone calls to the remaining board members, because there was no evidence that Eisner discussed the details of the OEA with those directors, and there was no contemporaneous documentary evidence of the content or the subject of those calls. The Court of Chancery, however, had sufficient evidence from which to make that finding. Directors Eisner, Gold, Bollenbach, Mitchell, Nunis, Lozano, and Stern testified that those conversations took place, and Eisner's telephone log corroborated that testimony. Post–Trial Op. at n. 72. At bottom, the appellants are claiming that the Chancellor should have disbelieved Eisner's testimony. That is a credibility determination based on testimony that the Chancellor, as the finder of fact, was entitled to make and that this Court will approve on review. *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del.

That same day, a press release made the news of Ovitz's hiring public. The reaction was extremely positive: Disney was applauded for the decision, and Disney's stock price rose 4.4 % in a single day, thereby increasing Disney's market capitalization by over $1 billion.

Once the OLA was signed, Joseph Santaniello, a Vice President and counsel in Disney's legal department, began to embody in a draft OEA the terms that Russell and Goldman had agreed upon and had been memorialized in the OLA. In the process, Santaniello concluded that the $50 million guarantee created negative tax implications for Disney, because it might not be deductible. Concluding that the guarantee should be eliminated, Russell initiated discussions on how to compensate Ovitz for this change. What resulted were several amendments to the OEA to replace the back-end guarantee. The (to-be-eliminated) $50 million guarantee would be replaced by: (i) a reduction in the option strike price from 115% to 100% of the Company's stock price on the day of the grant for the two million options that would become exercisable in the sixth and seventh year of Ovitz's employment; (ii) a $10 million severance payment if the Company did not renew Ovitz's contract; and (iii) an alteration of the renewal option to provide for a five-year extension, a $1.25 million annual salary, the same bonus structure as the first five years of the contract, and a grant of three million additional options. To assess the potential consequences of the proposed changes, Watson worked with Russell and Crystal, who applied the Black–Scholes method to evaluate the extended exercisability features of the options. Watson also generated his own separate analysis.

On September 26, 1995, the Disney compensation committee (which consisted of Messrs. Russell, Watson, Poitier and Lozano) met for one hour to consider, among other agenda items, the proposed terms of the OEA. A term sheet was distributed at the meeting, although a draft of the OEA was not. The topics discussed were historical comparables, such as Eisner's and Wells' option grants, and also the factors that Russell, Watson and Crystal had considered in setting the size of the option grants and the termination provisions of the contract. Watson testified that he provided the compensation committee with the spreadsheet analysis that he had performed in August, and discussed his findings with the committee.[13] Crystal did not attend the meeting, although he was available by telephone to respond to questions if needed, but no one from the committee called. After Russell's and Watson's presentations, Litvack also responded to substantive questions. At trial Poitier and Lozano testified that they believed they had received sufficient information from Russell's and Watson's presentations to exercise their judgment in the best interests of the Company. The committee voted unanimously to approve the OEA terms, subject to "reasonable further negotiations within the framework of the terms and conditions" described in the OEA.

1972); *Alabama By–Products v. Neal*, 588 A.2d 255, 259 (Del.1991).

**13.** In their Opening Brief, the appellants emphasize that during their trial testimony, neither Poitier nor Lozano could recall seeing Watson's spreadsheets at the September 26th meeting, and the meeting minutes did not indicate any discussion about the cost of a NFT payout. The Court of Chancery found that Poitier's and Lozano's lack of recollection on that point was more likely the result of the nine years that had passed since the meeting, and credited Watson's testimony that he had distributed the spreadsheets. Post-trial Op. at ——, *9, n. 82.

Immediately after the compensation committee meeting, the Disney board met in executive session. The board was told about the reporting structure to which Ovitz had agreed, but the initial negative reaction of Litvack and Bollenbach to the hiring was not recounted. Eisner led the discussion relating to Ovitz, and Watson then explained his analysis, and both Watson and Russell responded to questions from the board. After further deliberation, the board voted unanimously to elect Ovitz as President.

At its September 26, 1995 meeting, the compensation committee determined that it would delay the formal grant of Ovitz's stock options until further issues between Ovitz and the Company were resolved. That was done, and the committee met again, on October 16, 1995, to discuss stock option-related issues. The committee approved amendments to the Walt Disney Company 1990 Stock Incentive Plan (the "1990 Plan"), and also approved a new plan, known as the Walt Disney 1995 Stock Incentive Plan (the "1995 Plan"). Both plans were subject to further approval by the full board of directors and the shareholders. Both the amendment to the 1990 Plan and the Stock Option Agreement provided that in the event of a non-fault termination ("NFT"), Ovitz's options would be exercisable until the later of September 30, 2002 or twenty-four months after termination, but in no event later than October 16, 2005. After approving those Plans, the committee unanimously approved the terms of the OEA and the award of Ovitz's options under the 1990 Plan.

## B. Ovitz's Performance As President of Disney

Ovitz's tenure as President of the Walt Disney Company officially began on October 1, 1995, the date that the OEA was executed.[14] When Ovitz took office, the initial reaction was optimistic, and Ovitz did make some positive contributions while serving as President of the Company.[15]

---

14. The appellants contend, as a factual matter, that Ovitz became the *"de facto"* President of Disney before October 1, 1995, and as a result, owed fiduciary duties to Ovitz before his official start date. The appellants assert that "Ovitz's substantial contacts with third parties and his receipt of confidential Disney information before October 1st show that Eisner and Disney had already vested him with at least apparent authority prior to his formal investiture in office." (Appellants' Opening Br. at 46–47). Appellants base this contention upon (i) Ovitz having played a role in the design and construction of his new office at Disney in August 1995; (ii) Ovitz being furnished internal documents during that summer; (iii) Ovitz having met with third parties on Disney's behalf in relation to a deal Disney was considering with the NFL; and (iv) Ovitz having submitted requests for reimbursement for business related expenses during the pre-October 1 period. The Court of Chancery's findings undermine that contention. The Chancellor found that Ovitz's authority over the construction project was "minimal at best" (Post-trial Op. at ——, *12); that the pre-October 1 work that he performed at Disney was in preparation for his tenure there and made his request for reimbursement of expenses related to Disney "appropriate and reasonable" (*Id.* at n. 133); and that any work Ovitz did on Disney's behalf with respect to the NFL was evidence of "Ovitz's good faith efforts to benefit the Company and bring himself up to speed...." (*Id.* at ——, *12).

15. As the Chancellor found, Ovitz made the successful recommendation to construct the gate to Disney's California Adventure Park across from the main gate to Disneyland. He was also able to recruit Geraldine Laybourne, founder of the children's cable channel, Nickelodeon, as well as overhaul ABC's Saturday morning lineup. Ovitz brought Tim Allen back to work after Allen walked off the set of Home Improvement following a disagreement; he also helped retain several animators that Jeffrey Katzenberg was trying to recruit to his new company, Dreamworks; and Ovitz also helped in handling relationships with talent.

By the fall of 1996, however, it had become clear that Ovitz was "a poor fit with his fellow executives."[16] By then the Disney directors were discussing that the disconnect between Ovitz and the Company was likely irreparable and that Ovitz would have to be terminated.

The Court of Chancery identified three competing theories as to why Ovitz did not succeed:

First, plaintiffs argue that Ovitz failed to follow Eisner's directives, especially in regard to acquisitions, and that generally, Ovitz did very little. Second, Ovitz contends Eisner's micromanaging prevented Ovitz from having the authority necessary to make the changes that Ovitz thought were appropriate. In addition, Ovitz believes he was not given enough time for his efforts to bear fruit. Third, the remaining defendants simply posit that Ovitz failed to transition from a private to a public company, from the "sell side to the buy side," and otherwise did not adapt to the Company culture or fit in with other executives. In the end, however, it makes no difference why Ovitz was not as successful as his reputation would have led many to expect, so long as he was not grossly negligent or malfeasant.[17]

Although the plaintiffs attempted to show that Ovitz acted improperly (*i.e.*, with gross negligence or malfeasance) while in office, the Chancellor found that the trial record did not support those accusations.[18] Rejecting the plaintiffs' first factual claim

that Ovitz was insubordinate, the Court found that although many of Ovitz's efforts failed to produce results, that was because his efforts often reflected a philosophy opposite to "that held by Eisner, Iger, and Roth."[19] That difference did not mean, however, "that Ovitz intentionally failed to follow Eisner's directives or that [Ovitz] was insubordinate."[20]

The Chancellor also rejected the appellants' second claim—that Ovitz was a habitual liar. The Court found no evidence that Ovitz ever told a material falsehood or made any false or misleading disclosures during his tenure at Disney.[21] Lastly, the Chancellor found that the record did not support, and often contradicted, the appellants' third claim—that Ovitz had violated the Company's policies relating to expenses and to reporting gifts he received while President of Disney.[22]

Nonetheless, Ovitz's relationship with the Disney executives did continue to deteriorate through September 1996. In mid-September, Litvack, with Eisner's approval, told Ovitz that he was not working out at Disney and that he should start looking for a graceful exit from Disney and a new job. Litvack reported this conversation to Eisner, who sent Litvack back to Ovitz to make it clear that Eisner no longer wanted Ovitz at Disney and that Ovitz should seriously consider other opportunities, including one then developing at Sony. Ovitz responded by telling Litvack that he was not leaving and that if Eisner wanted him

---

16. Post-trial Op. at ——, *11.

17. Post-trial Op. at ——, *14 (footnotes omitted).

18. *Id.* at ——, *12.

19. *Id.* at ——, *14 (The surname references are to Robert Iger, President of ABC, and Joe Roth, head of the Disney Studio).

20. *Id.* ("But different does not mean wrong. Total agreement within an organization is often a far greater threat than diversity of opinion. Unfortunately, the philosophical divide between Eisner and Ovitz was greater than both believed....").

21. *Id.* at —— - ——, *14–15.

22. *Id.* at ——, *16.

to leave Disney, Eisner could tell him that to his face.

On September 30, 1996, the Disney board met. During an executive session of that meeting, and in small group discussions where Ovitz was not present, Eisner told the other board members of the continuing problems with Ovitz's performance. On October 1, Eisner wrote a letter to Russell and Watson detailing Eisner's mounting difficulties with Ovitz, including Eisner's lack of trust of Ovitz and Ovitz's failures to adapt to Disney's culture and to alleviate Eisner's workload. Eisner's goal in writing this letter was to prevent Ovitz from succeeding him at Disney. Because of that purpose, the Chancellor found that the letter contained "a good deal of hyperbole to help Eisner 'unsell' Ovitz as his successor." [23] Neither that letter nor its contents were shared with other members of the board.

Those interchanges set the stage for Ovitz's eventual termination as Disney's President.

### C. *Ovitz's Termination At Disney*

After the discussions between Litvack and Ovitz, Eisner and Ovitz met several times. During those meetings they discussed Ovitz's future, including Ovitz's employment prospects at Sony. Eisner believed that because Ovitz had a good, longstanding relationship with many Sony senior executives, Sony would be willing to take Ovitz in "trade" from Disney. Eisner favored such a trade, which would not only remove Ovitz from Disney, but also would relieve Disney of any obligation to pay Ovitz under the OEA. Thereafter, in October 1996, Ovitz, with Eisner's permission, entered into negotiations with Sony. Those negotiations did not prove fruitful, however. On November 1, Ovitz wrote a letter to Eisner notifying him that the Sony negotiations had ended, and that Ovitz had decided to recommit himself to Disney with a greater dedication of his own energies and an increased appreciation of the Disney organization.

In response to this unwelcome news, Eisner wrote (but never sent) a letter to Ovitz on November 11, in which Eisner attempted to make it clear that Ovitz was no longer welcome at Disney.[24] Instead of sending that letter, Eisner met with Ovitz personally on November 13, and discussed much of what the letter contained. Eisner left that meeting believing that "Ovitz just would not listen to what he was trying to tell him and instead, Ovitz insisted that he would stay at Disney, going so far as to state that he would chain himself to his desk." [25]

During this period Eisner was also working with Litvack to explore whether they could terminate Ovitz under the OEA for cause. If so, Disney would not owe Ovitz the NFT payment. From the very beginning, Litvack advised Eisner that he did not believe there was cause to terminate Ovitz under the OEA. Litvack's advice never changed.

At the end of November 1996, Eisner again asked Litvack if Disney had cause to fire Ovitz and thereby avoid the costly NFT payment. Litvack proceeded to examine that issue more carefully. He studied the OEA, refreshed himself on the meaning of "gross negligence" and "malfeasance," and reviewed all the facts

---

**23.** Post-trial Op. at ——, *19.

**24.** As with his October 1 letter, Eisner did not share this letter or its contents with the board. The only director to receive the No-vember 11 letter was Russell, who also did not share it with the other board members.

**25.** Post-trial Op. at ——, *19 (footnote omitted).

concerning Ovitz's performance of which he was aware. Litvack also consulted Val Cohen, co-head of Disney's litigation department and Joseph Santaniello, in Disney's legal department. Cohen and Santaniello both concurred in Litvack's conclusion that no basis existed to terminate Ovitz for cause. Litvack did not personally conduct any legal research or request an outside opinion on the issue, because he believed that it "was not a close question, and in fact, Litvack described it as 'a no brainer.' "[26] Eisner testified that after Litvack notified Eisner that he did not believe cause existed, Eisner "checked with almost anybody that [he] could find that had a legal degree, and there was just no light in that possibility. It was a total dead end from day one."[27] Although the Chancellor was critical of Litvack and Eisner for lacking sufficient documentation to support his conclusion and the work they did to arrive at that conclusion, the Court found that Eisner and Litvack "did in fact make a concerted effort to determine if Ovitz could be terminated for cause, and that despite these efforts, they were unable to manufacture the desired result."[28]

Litvack also believed that it would be inappropriate, unethical and a bad idea to attempt to coerce Ovitz (by threatening a for-cause termination) into negotiating for a smaller NFT package than the OEA provided. The reason was that when pressed by Ovitz's attorneys, Disney would have to admit that in fact there was no cause, which could subject Disney to a wrongful termination lawsuit. Litvack believed that attempting to avoid legitimate contractual obligations would harm Disney's reputation as an honest business partner and would affect its future business dealings.

The Disney board next met on November 25. By then the board knew Ovitz was going to be fired, yet the only action recorded in the minutes concerning Ovitz was his renomination to a new three-year term on the board. Although that action was somewhat bizarre given the circumstances, Stanley Gold, a Disney director, testified that because Ovitz was present at that meeting, it would have been a "public hanging" not to renominate him.[29] An executive session took place after the board meeting, from which Ovitz was excluded. At that session, Eisner informed the directors who were present that he intended to fire Ovitz by year's end, and that he had asked Gary Wilson, a board member and friend of Ovitz, to speak with Ovitz while Wilson and Ovitz were together on vacation during the upcoming Thanksgiving holiday.[30]

Shortly after the November 25 board meeting and executive session, the Ovitz and Wilson families left on their yacht for a Thanksgiving trip to the British Virgin Islands. Ovitz hoped that if he could man-

---

**26.** *Id.* at ——, 20.

**27.** *Id.*

**28.** *Id.* The Chancellor found Litvack's testimony on this issue especially persuasive because "[i]n light of the hostile relationship between Litvack and Ovitz, I believe that if Litvack thought it were possible to avoid paying Ovitz the NFT payment, that out of pure ill-will, Litvack would have tried almost anything to avoid the payment." *Id.* at ——, *20, n. 269.

**29.** *Id.* at ——, *21.

**30.** The Court of Chancery found that at least Eisner, Gold, Bowers, Watson, and Stern were present at that executive session. The Court also found that the record was in conflict as to whether any details of the NFT and the termination for cause question were discussed.

age to survive at Disney until Christmas, he could fix everything with Disney and make his problems go away. Wilson quickly dispelled that illusion, informing Ovitz that Eisner wanted Ovitz out of the Company. At that point Ovitz first began to realize how serious his situation at Disney had become. Reporting back his conversation with Ovitz, Wilson told Eisner that Ovitz was a "loyal friend and devastating enemy,"[31] and he advised Eisner to "be reasonable and magnanimous, both financially and publicly, so Ovitz could save face."[32]

After returning from the Thanksgiving trip, Ovitz met with Eisner on December 3, to discuss his termination. Ovitz asked for several concessions, all of which Eisner ultimately rejected. Eisner told Ovitz that all he would receive was what he had contracted for in the OEA.

On December 10, the Executive Performance Plan Committee met to consider annual bonuses for Disney's most highly compensated executive officers. At that meeting, Russell informed those in attendance[33] that Ovitz was going to be terminated, but without cause.[34]

On December 11, Eisner met with Ovitz to agree on the wording of a press release to announce the termination, and to inform Ovitz that he would not receive any of the additional items that he requested. By that time it had already been decided that Ovitz would be terminated without cause and that he would receive his contractual NFT payment, but nothing more. Eisner and Ovitz agreed that neither Ovitz nor Disney would disparage each other in the press, and that the separation was to be undertaken with dignity and respect for both sides. After his December 11 meeting with Eisner, Ovitz never returned to Disney.

Ovitz's termination was memorialized in a letter, dated December 12, 1996, that Litvack signed on Eisner's instruction. The board was not shown the letter, nor did it meet to approve its terms. A press release announcing Ovitz's termination was issued that same day. Before the press release was issued, Eisner attempted to contact each of the board members by telephone to notify them that Ovitz had been officially terminated. None of the board members at that time, or at any other time, objected to Ovitz's termination, and most, if not all, of them thought it was the appropriate step for Eisner to take.[35] Although the board did not meet to vote on the termination, the Chancellor found that most, if not all, of the Disney directors trusted Eisner's and Litvack's conclusion that there was no cause to terminate Ovitz, and that Ovitz should be terminated without cause even though that involved making the costly NFT payment.[36]

---

**31.** *Id.* at ——, 22.

**32.** *Id.*

**33.** In attendance at that meeting were its members, Gold, Lozano, Poitier and Russell, although Poitier and Lozano attended by phone. Also in attendance were Eisner, Watson, Litvack, Santaniello, and another staff member, Marsha Reed.

**34.** The committee members also awarded a $7.5 million bonus to Ovitz for his services performed during fiscal year 1996, despite Ovitz's poor performance and the fact that the bonuses were discretionary. That bonus was later rescinded after more deliberate consideration, following Ovitz's termination.

**35.** Post-trial Op. at ——, *24 & n. 325, 326.

**36.** *Id.* at ——, *25 & n. 332. Although neither the board nor the compensation committee voted on the matter, many directors believed that Eisner had the power to fire Ovitz on his own, and that he did not need to convene a board meeting to do so. Other directors believed that if a meeting was required to terminate Ovitz, then Litvack, as

A December 27, 1996 letter from Litvack to Ovitz, which Ovitz signed, memorialized the termination, accelerated Ovitz's departure date from January 31, 1997 to December 31, 1996, and informed Ovitz that he would receive roughly $38 million in cash and that the first tranche of three million options would vest immediately. By the terms of that letter agreement, Ovitz's tenure as an executive and a director of Disney officially ended on December 27, 1996. Shortly thereafter, Disney paid Ovitz what was owed under the OEA for an NFT, minus a holdback of $1 million pending final settlement of Ovitz's accounts. One month after Disney paid Ovitz, the plaintiffs filed this action.

## II. *SUMMARY OF APPELLANTS' CLAIMS OF ERROR*

As noted earlier, the Court of Chancery rejected all of the plaintiff-appellants' claims on the merits and entered judgment in favor of the defendant-appellees on all counts. On appeal, the appellants claim that the adverse judgment rests upon multiple erroneous rulings and should be reversed, because the 1995 decision to approve the OEA and the 1996 decision to terminate Ovitz on a non-fault basis, resulted from various breaches of fiduciary duty by Ovitz and the Disney directors.

■■■ The appellants' claims of error are most easily analyzed in two separate groupings: (1) the claims against the Disney defendants and (2) the claims against Ovitz. The first category encompasses the claims that the Disney defendants breached their fiduciary duties to act with due care and in good faith by (1) approving the OEA, and specifically, its NFT provisions; and (2) approving the NFT severance payment to Ovitz upon his termination—a payment that is also claimed to constitute corporate waste. It is notable that the appellants do *not* contend that the Disney defendants are directly liable as a consequence of those fiduciary duty breaches. Rather, appellants' core argument is indirect, *i.e.*, that those breaches of fiduciary duty deprive the Disney defendants of the protection of business judgment review, and require them to shoulder the burden of establishing that their acts were entirely fair to Disney. That burden, the appellants contend, the Disney defendants failed to carry.[37] The appellants claim that by ruling that the Disney defendants did not breach their fiduciary duty to act with due care or in good faith, the Court of Chancery committed reversible error in numerous respects.[38] Alternatively, the

corporate counsel, would have so advised them and would have made sure that a meeting was called. Litvack believed that Eisner had the power to fire Ovitz on his own accord, and that no meeting was called, because it was unnecessary and because all the directors were up to speed and in agreement that Ovitz should be terminated.

37. The plaintiff-appellants appear to have structured their liability claim in this indirect way because Article Eleventh of the Disney Certificate of Incorporation contains an exculpatory provision modeled upon 8 *Del. C.* § 102(b)(7). That provision precludes a money damages remedy against the Disney directors for adjudicated breaches of their duty of care. For that reason the plaintiffs are asserting their due care claim as the basis for shifting the standard of review from business judgment to entire fairness, rather than as a basis for direct liability. Presumably for the sake of consistency the appellants are utilizing their good faith fiduciary claim in a like manner.

38. These claims are asserted against the Disney defendants in their capacity as directors. The appellants also advance, as an alternative claim, an argument that Disney defendants Eisner, Litvack and Russell, are liable in their separate capacity as officers who, unlike directors, are not protected by the business judgment rule or the exculpatory provision of the Disney charter. That alternative argument is procedurally barred, because it was

appellants claim that even if the business judgment presumptions apply, the Disney defendants are nonetheless liable, because the NFT payout constituted corporate waste and the Court of Chancery erred in concluding otherwise.[39]

Falling into the second category are the claims being advanced against Ovitz. Appellants claim that Ovitz breached his fiduciary duties of care and loyalty to Disney by (i) negotiating for and accepting the NFT severance provisions of the OEA, and (ii) negotiating a full NFT payout in connection with his termination.[40] The appellants' position is that by concluding that Ovitz breached no fiduciary duty owed to Disney, the Court of Chancery reversibly erred in several respects.

In this Opinion we address these two groups of claims in reverse order. In Part III, we analyze the claims relating to Ovitz. In Part IV, we address the claims asserted against the Disney defendants.

### III. *THE CLAIMS AGAINST OVITZ*

The appellants argue that the Chancellor erroneously rejected their claims

against Ovitz on two distinct grounds. We analyze them separately.

### A. *Claims Based Upon Ovitz's Conduct Before Assuming Office At Disney*

First, appellants contend that the Court of Chancery erred by dismissing their claim, as a summary judgment matter, that Ovitz had breached his fiduciary duties to Disney by negotiating and entering into the OEA. On summary judgment the Chancellor determined that Ovitz had breached no fiduciary duty to Disney, because Ovitz did not become a fiduciary until he formally assumed office on October 1, 1995, by which time the essential terms of the NFT provision had been negotiated. Therefore, the Court of Chancery held, Ovitz's pre-October 1 conduct was not constrained by any fiduciary duty standard.

That ruling was erroneous, appellants argue, because even though Ovitz did not formally assume the title of President until October 1, 1995, he became a *de facto* fiduciary before then. As a result, the entire OEA negotiation process became subject to a fiduciary review standard.

not fairly presented to the Court of Chancery. Sup.Ct. R. 8. Indeed, the Chancellor noted in his Post-trial Opinion that the application of the business judgment to Eisner and Litvack was not contested, and that the "parties essentially treat both officers and directors as comparable fiduciaries, that is, subject to the same fiduciary duties and standards of substantive review." Post-trial Op. at ——, *50, n. 588. To the extent the argument is advanced against Russell, it also is not grounded in fact, because Russell was not an officer of Disney.

39. "When a plaintiff fails to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste." Post-trial Op. at ——, *31 (citing *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780 (Del.Ch.1988)).

40. The claims against Ovitz, unlike those asserted against the Disney defendants, appear to be advanced as the basis for holding Ovitz liable directly, as distinguished from being used indirectly as a vehicle to shift the standard of review from business judgment to entire fairness. We use the qualifying term "appear," because we cannot ascertain with clarity, either from the appellants' briefs in this Court or in the Court of Chancery, the precise character of their liability argument. In the end, however, it does not matter, because our affirmance of the Chancellor's rulings render irrelevant the issue of whether appellants are asserting a claim of liability directly as a consequence of a breach of Ovitz's duty of loyalty and/or good faith, or indirectly as a consequence of his failure to prove the entire fairness of his actions.

That conclusion is compelled, appellants urge, because Ovitz's substantial contacts with third parties, and his receipt of confidential Disney information and request for reimbursement of expenses before October 1, prove that Eisner and Disney had already vested Ovitz with at least apparent authority before his formal investiture in office. Therefore, summary judgment was inappropriate, not only for those reasons but also because before summary judgment was granted, Ovitz failed to produce his work files that would have established his *de facto* status. Lastly, appellants contend that even if Ovitz was not a fiduciary until October 1, he is still liable for negotiating the NFT provisions because the OEA was considerably revised after October 1 and did not become final until December 1995. At the very least, issues of fact concerning those revisions should have precluded summary judgment.

■ On appeal from a decision granting summary judgment, this Court reviews the entire record to determine whether the Chancellor's findings are clearly supported by the record and whether the conclusions drawn from those findings are the product of an orderly and logical reasoning process.[41] This Court does not draw its own conclusions with respect to those facts unless the record shows that the trial court's findings are clearly wrong and justice so requires.[42] Whether the Chancellor cor-

rectly formulated the legal standard for determining if Ovitz owed a fiduciary duty to Disney during the OEA negotiations presents a question of law that this Court reviews *de novo*.[43] Under any and all of these standards of review, the appellants have failed to persuade us that the Chancellor committed any error of fact or law.

■ As a threshold matter, the appellants' *de facto* fiduciary argument is procedurally barred, because it was never fairly presented to the Court of Chancery. Only questions fairly presented to the trial court are properly before this Court for review.[44] In the Court of Chancery the appellants, as plaintiffs, never opposed the Ovitz motion for summary judgment on the ground that Ovitz was a *de facto* officer, nor did they move for reconsideration of the summary judgment motion after they received (post-summary judgment) the documents they contend should have been produced to them earlier.[45]

■ In any event, the *de facto* officer argument lacks merit, both legally and factually. A *de facto* officer is one who actually assumes possession of an office under the claim and color of an election or appointment and who is actually discharging the duties of that office, but for some legal reason lacks *de jure* legal title to that office.[46] Here, Ovitz did not assume, or

---

**41.** *Dutra De Amorim v. Norment*, 460 A.2d 511, 514 (Del.1983) (citing *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del.1972)).

**42.** *Fiduciary Trust Co. v. Fiduciary Trust Co.*, 445 A.2d 927, 930 (Del.1982).

**43.** *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del.1993).

**44.** Sup.Ct. R. 8.

**45.** Four months elapsed between the summary judgment decision and the end of trial, yet the plaintiffs never sought reconsideration

of the summary judgment motion on the basis of the evidence produced after the motion was decided.

**46.** William Meade Fletcher, Fletcher Cyclopedia Of The Law Of Private Corporations § 374 (perm.ed., rev.vol.1998) ("Fletcher"); *see also State ex rel. James v. Schorr*, 65 A.2d 810, 817 (Del.1948); *Rudnitsky v. Rudnitsky*, 2000 WL 1724234, *6, 2000 Del. Ch. LEXIS 165, *21 (Nov. 14, 2000) ("It is an established principle of Delaware law that apparent authority cannot be asserted by a party who knew, at the time of the transaction, that the agent lacked actual authority.")

purport to assume, the duties of the Disney presidency before October 1, 1995. In his post-trial Opinion, the Chancellor found as fact that all of Ovitz's pre-October 1 conduct upon which appellants rely to establish *de facto* officer status, represented Ovitz's preparations to assume the duties of President after he was formally in office.[47] The record amply supports those findings.

■ Similarly unavailing is the appellants' alternative argument that even if Ovitz did not become a fiduciary until October 1, his negotiation of the OEA must nonetheless be measured by fiduciary standards, because the OEA did not become final until December 1995, and because between October 1 and December 1995, substantial redrafting of the OEA had occurred. This argument lacks merit because the critical terms of Ovitz's employment that are at issue in this lawsuit were found to have been agreed to before Ovitz assumed office on October 1. The Chancellor further found that any changes negotiated after October 1 were not material. The appellants have not shown that those findings are clearly wrong.[48]

### B. Claims Based Upon Ovitz's Conduct During His Termination As President

The appellants' second claim is that the Court of Chancery erroneously concluded that Ovitz breached no fiduciary duty, including his duty of loyalty, by receiving the NFT payment upon his termination as President of Disney. The Chancellor found:

> Ovitz did not breach his fiduciary duty of loyalty by receiving the NFT payment because he played no part in the decisions: (1) to be terminated and (2) that the termination would not be for cause under the OEA. Ovitz did possess fiduciary duties as a director and officer while these decisions were made, but by not improperly interjecting himself into the corporation's decisionmaking process nor manipulating that process, he did not breach the fiduciary duties he possessed in that unique circumstance. Furthermore, Ovitz did not "engage" in a transaction with the corporation—rather, the corporation imposed an unwanted transaction upon him.
>
> Once Ovitz was terminated without cause (as a result of decisions made entirely without input or influence from Ovitz), he was contractually entitled, without any negotiation or action on his part, to receive the benefits provided by the OEA for a termination without cause, benefits for which he negotiated at arm's length *before* becoming a fiduciary.[49]

The appellants claim that these findings are reversible error, because the contemporaneous evidence shows that Ovitz was not fired but, rather, acted to "settle out his contract."[50] In those circumstances, appellants urge, Ovitz had a fiduciary duty

---

47. *See* discussion *supra* at p. 41, note 14.

48. The only evidence the appellants cite to support the claimed material change to the OEA is the assertion that after October 1, a "major rewrite of Section 10" occurred. (Appellants' Opening Br. at 47.) The rewrite of that section was not material, however. It only changed the terms that Disney must meet to make a "qualifying offer" to renew the OEA for a second term—from specific thresholds to a general requirement that Disney must make a "reasonable" offer. That change was not material to the issues presented in this lawsuit, and was not a critical term of the OEA.

49. Post-trial Op. at ——, *37–38 (italics in original, footnotes omitted).

50. Appellants' Opening Br. at 47.

to convene a board meeting to consider terminating him for cause—a duty that he failed to observe.

■■■ These arguments amount essentially to an attack upon the trial court's factual findings. To the extent those findings turn on determinations of the credibility of live witness testimony and the acceptance or rejection of particular items of testimony, those findings will be upheld.[51] To the extent the challenged factual findings do not turn on the credibility of live witnesses, this Court will accept those findings if they are supported by the evidence and are the product of an orderly and logical reasoning process.[52] And, insofar as this claim of error challenges the Chancellor's legal rulings, we review those rulings de novo.[53] The appellants' arguments fail to pass muster under any of these standards.

The record establishes overwhelmingly that Ovitz did not leave Disney voluntarily. Nor did Ovitz arrange beforehand with Eisner to structure his departure as a termination without cause. To be sure, the evidence upon which the appellants rely does show that Ovitz fought being forced out every step of the way, but in the end, Ovitz had no choice but to accept the inevitable. As the trial court found, "Ovitz did not 'engage' in a transaction with the corporation—rather, the corporation imposed an unwanted transaction upon him."[54] Every witness with personal knowledge of the events confirmed the unilateral, involuntary nature of Ovitz's termi-

nation in credible and colorful detail. The Chancellor credited the testimony of those witnesses, and the appellants have not shown that the Court exercised its fact finding powers inappropriately.

Nor is there any basis to overturn the Court of Chancery's finding that Ovitz played no role in the directors' decision to terminate him without cause. At trial the plaintiff-appellants attempted to prove that Ovitz had colluded with Eisner and others to obtain an NFT payment to which he was not entitled. The Chancellor found the facts to be otherwise, and ample evidence supports that finding. The record shows that the discussions between Eisner and Litvack as to the nature of the termination took place outside of Ovitz's presence and knowledge. At no point before this litigation was Ovitz ever told that Disney had even considered a for-cause termination a possibility. And, it is undisputed that Ovitz made no attempt to influence the board during that process.[55]

■■■ That brings us to the appellants' final Ovitz-related claim, which is that Ovitz breached a fiduciary duty to Disney by not convening a meeting of the Disney board to consider terminating him for cause. That argument is defective both legally and factually. The appellants cite no authority recognizing such a duty in these circumstances. That comes as no surprise, given the Chancellor's affirmation of Litvack's legal conclusion that no

---

**51.** *Levitt v. Bouvier,* 287 A.2d 671, 673 (Del. 1972).

**52.** *Id.; see also Hudak v. Procek,* 806 A.2d 140, 151 n. 28 (Del.2002) (The Chancellor is "the sole judge of the credibility of live witness testimony.").

**53.** *Hudak,* 806 A.2d at 150.

**54.** Post-trial Op. at ——, *37.

**55.** The only negotiation in which Ovitz engaged with Disney concerned how the NFT would work and what, if anything, Ovitz would receive in addition to the NFT. The trial court found, however, and the appellants do not contest, that Disney rejected all of Ovitz's requests and gave him only what he was entitled to receive under his contract.

board action was required to terminate Ovitz and that no basis existed to terminate him for cause.[56] The argument also fails factually because Ovitz never knew that a termination for cause was being considered. As the Court of Chancery stated:

No reasonably prudent fiduciary in Ovitz's position would have unilaterally determined to call a board meeting to force the corporation's chief executive officer to reconsider his termination and the terms thereof, with that reconsideration for the benefit of shareholders and potentially to Ovitz's detriment.

Furthermore, having just been terminated, no reasonably prudent fiduciary in Ovitz's shoes would have insisted on a board meeting to discuss and ratify his termination after being terminated by the corporation's *chief executive officer* (with guidance and assistance from the Company's general counsel). Just as Delaware law does not require directors-to-be to comply with their fiduciary duties, former directors owe no fiduciary duties, and after December 27, 1996, Ovitz could not breach a duty he no longer had.[57]

The Court of Chancery determined that Ovitz did not breach any fiduciary duty that he owed to Disney when negotiating for, or when receiving severance payments under, the non-fault termination clause of the OEA. The Court made no error in arriving at that determination and we uphold it.[58]

## IV. THE CLAIMS AGAINST THE DISNEY DEFENDANTS

We next turn to the claims of error that relate to the Disney defendants. Those claims are subdivisible into two groups: (A) claims arising out of the approval of the OEA and of Ovitz's election as President; and (B) claims arising out of the NFT severance payment to Ovitz upon his termination. We address separately those two categories and the issues that they generate.

### A. Claims Arising From The Approval Of The OEA And Ovitz's Election As President

As earlier noted, the appellants' core argument in the trial court was that the Disney defendants' approval of the OEA and election of Ovitz as President were not entitled to business judgment rule protection, because those actions were either grossly negligent or not performed in good faith. The Court of Chancery rejected these arguments, and held that the appellants had failed to prove that the Disney defendants had breached any fiduciary duty.

For clarity of presentation we address the claimed errors relating to the fiduciary duty of care rulings separately from those that relate to the directors' fiduciary duty to act in good faith.

---

56. Post-trial Op. at ——, ——, *38–39, 48–49. For the reasons more fully set forth in Section V, *infra*, of this Opinion, we uphold these determinations.

57. *Id.* at 52, *38 (italics in original, footnotes omitted).

58. That determination stands independent of, and without regard to, whether the OEA and the NFT payout were properly approved, constituted a waste of assets or were otherwise the product of a breach of fiduciary duty by the Disney defendants. The appellants claim that the approval of the OEA and the NFT payout to Ovitz were legally improper on all these grounds. Those claims are addressed in Parts IV and V of this Opinion.

### 1. *The Due Care Determinations*

The plaintiff-appellants advance five contentions to support their claim that the Chancellor reversibly erred by concluding that the plaintiffs had failed to establish a violation of the Disney defendants' duty of care. The appellants claim that the Chancellor erred by: (1) treating as distinct questions whether the plaintiffs had established by a preponderance of the evidence either gross negligence or a lack of good faith; (2) ruling that the old board was not required to approve the OEA; (3) determining whether the old board had breached its duty of care on a director-by-director basis rather than collectively; (4) concluding that the compensation committee members did not breach their duty of care in approving the NFT provisions of the OEA; and (5) holding that the remaining members of the old board (*i.e.*, the directors who were not members of the compensation committee) had not breached their duty of care in electing Ovitz as Disney's President.

To the extent that these claims attack legal rulings of the Court of Chancery we review them *de novo*.[59] To the extent they attack the Court's factual findings, those findings will be upheld where they are based on the Chancellor's assessment of live testimony.[60] The issue these claims present is whether the Court of Chancery legally (and reversibly) erred in one or more of the foregoing respects. We conclude that the Chancellor committed no error.

### (a) TREATING DUE CARE AND BAD FAITH AS SEPARATE GROUNDS FOR DENYING BUSINESS JUDGMENT RULE REVIEW

This argument is best understood against the backdrop of the presumptions that cloak director action being reviewed under the business judgment standard. Our law presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company."[61] Those presumptions can be rebutted if the plaintiff shows that the directors breached their fiduciary duty of care or of loyalty or acted in bad faith. If that is shown, the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders.[62]

Because no duty of loyalty claim was asserted against the Disney defendants, the only way to rebut the business judgment rule presumptions would be to show that the Disney defendants had either breached their duty of care or had not acted in good faith. At trial, the plaintiff-appellants attempted to establish both grounds, but the Chancellor determined that the plaintiffs had failed to prove either.

The appellants' first claim is that the Chancellor erroneously (i) failed to make a "threshold determination" of gross negligence, and (ii) "conflated" the appellants'

59. *Hudak*, 806 A.2d at 150.

60. *Levitt*, 287 A.2d at 673.

61. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

62. *Emerald Partners v. Berlin*, 787 A.2d 85, 91 (Del.2001); *Brehm v. Eisner*, 746 A.2d 244, 264 n. 66 (Del.2000) ("Thus, directors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available.").

burden to rebut the business judgment presumptions, with an analysis of whether the directors' conduct fell within the 8 *Del. C.* § 102(b)(7) provision that precludes exculpation of directors from monetary liability "for acts or omissions not in good faith." The argument runs as follows: *Emerald Partners v. Berlin*[63] required the Chancellor first to determine whether the business judgment rule presumptions were rebutted based upon a showing that the board violated its duty of care, *i.e.*, acted with gross negligence. If gross negligence were established, the burden would shift to the directors to establish that the OEA was entirely fair. Only if the directors failed to meet that burden could the trial court then address the directors' Section 102(b)(7) exculpation defense, including the statutory exception for acts not in good faith.

■■■ This argument lacks merit. To make the argument the appellants must ignore the distinction between (i) a determination of bad faith for the threshold purpose of rebutting the business judgment rule presumptions, and (ii) a bad faith determination for purposes of evaluating the availability of charter-authorized exculpation from monetary damage liability after liability has been established. Our law clearly permits a judicial assessment of director good faith for that former purpose.[64] Nothing in *Emerald Partners* requires the Court of Chancery to consider only evidence of lack of due care (*i.e.* gross negligence) in determining whether the business judgment rule presumptions have been rebutted.

■■■ Even if the trial court's analytical approach were improper, the appellants have failed to demonstrate any prejudice. The Chancellor's determinations of due care and good faith were analytically distinct and were separately conducted, even though both were done for the purpose of deciding whether to apply the business judgment standard of review. Nowhere have the appellants shown that the result would have been any different had the Chancellor proceeded in the manner that they now advocate.

## (b) RULING THAT THE FULL DISNEY BOARD WAS NOT REQUIRED TO CONSIDER AND APPROVE THE OEA

■■■ The appellants next challenge the Court of Chancery's determination that the full Disney board was not required to consider and approve the OEA, because the Company's governing instruments allocated that decision to the compensation committee.[65] This challenge also cannot survive scrutiny.

As the Chancellor found, under the Company's governing documents the board of directors was responsible for selecting the corporation's officers, but under the compensation committee charter, the committee was responsible for establishing and approving the salaries, together with benefits and stock options, of the Company's CEO and President.[66] The compensation committee also had the charter-imposed duty to "approve employment contracts, or contracts at will" for "all corporate officers who are members of the Board of Directors regardless of salary."[67] That is exactly what occurred here. The full board ultimately selected Ovitz as Presi-

---

63. 787 A.2d 85, 93 (Del.2001).

64. *Id.* at 91.

65. Post-trial Op. at ——, ——, *42, 47.

66. *Id.* at ——, ——, *42, 44.

67. *Id.* at ——, *42.

dent,[68] and the compensation committee considered and ultimately approved the OEA, which embodied the terms of Ovitz's employment, including his compensation.

The Delaware General Corporation Law (DGCL) expressly empowers a board of directors to appoint committees and to delegate to them a broad range of responsibilities,[69] which may include setting executive compensation. Nothing in the DGCL mandates that the entire board must make those decisions. At Disney, the responsibility to consider and approve executive compensation was allocated to the compensation committee, as distinguished from the full board. The Chancellor's ruling—that executive compensation was to be fixed by the compensation committee—is legally correct.

■ The appellants base their contrary argument upon their reading of this Court's opinion in *Brehm v. Eisner*.[70] A "central holding" of *Brehm*, which the appellants claim is the "law of the case," is that the Disney board had a duty to approve the OEA because of its materiality. The appellants misread *Brehm*. There, in upholding a dismissal of the complaint in a procedural setting where the complaint's well-pled allegations must be taken as true, we observed that "in this case the economic exposure of the corporation to the payout scenarios of the Ovitz contract was material, particularly given its large size, for purposes of the directors' decision-making process."[71] Contrary to the appellant's position, that observation is not the law of the case, because in *Brehm* this Court was not addressing, and did not have before it, the question of whether it was the exclusive province of the full board (as distinguished from a committee of the board) to approve the terms of the contract. That issue did not arise until the trial, during which a complete record was made. Therefore, in deciding the issue of which body—the full board or the compensation committee—was empowered to approve the OEA, the Chancellor was not constrained by any pronouncement made in Brehm.[72]

**68.** *Id.* at ——, *47.

**69.** 8 *Del. C.* § 141(c).

**70.** 746 A.2d 244, 259 (Del.2000).

**71.** *Id.*

**72.** The only arguably tenable "law of the case" contention might read *Brehm* to hold that the size of the NFT payout would be material to a decision maker, whether the decision maker is the full board or the compensation committee. Indeed, the appellants appear to suggest that argument in attacking as erroneous the Chancellor's determination that, even though the amount of the NFT payout was quite large, it was immaterial given the Company's size ($19 billion in revenues and over $3 billion in operating revenues) and the large amounts budgeted for a single feature film. *See* Post-trial Op. at ——, *44, n. 532. If that is appellants' argument, it also reads too much into the *Brehm* decision, because our observation was based upon the facts as alleged in the complaint, not the facts as found by the Chancellor based upon a complete trial record. This argument also ignores our admonition therein that "[o]ne must also keep in mind that the size of executive compensation for a large public company in the current environment often involves huge numbers. This is particularly true in the entertainment industry where the enormous revenues from one 'hit' movie or enormous losses from a 'flop' place in perspective the compensation of executives whose genius or misjudgment, as the case may be, have contributed to the 'hit' or 'flop.'" 746 A.2d at 259, n. 49 (internal citations omitted). In any event, the materiality or immateriality of the NFT payout, whether viewed from an *ex ante* or *ex post* perspective, is not legally germane to our analysis of the claims presented on this appeal, or to the result we reach here. For that reason we do not decide the issue of the materiality of the NFT payout.

(c) WHETHER THE BOARD MEMBERS' OBSERVANCE OF THEIR DUTY OF CARE SHOULD HAVE BEEN DETERMINED ON A DIRECTOR–BY–DIRECTOR BASIS OR COLLECTIVELY

■ In the Court of Chancery the appellants argued that the board had failed to exercise due care, using a director-by-director, rather than a collective analysis. In this Court, however, the appellants argue that the Chancellor erred in following that very approach. An about-face, the appellants now claim that in determining whether the board breached its duty of care, the Chancellor was legally required to evaluate the actions of the old board collectively.

We reject this argument, without reaching its merits, for two separate reasons. To begin with, the argument is precluded by Rule 8 of this Court, which provides that arguments not fairly presented to the trial court will not be considered by this Court.[73] The appellants' "individual vs. collective" argument goes beyond being not fairly presented. It borders on being unfairly presented, since the appellants are taking the trial court to task for adopting the very analytical approach that they themselves used in presenting their position.

■ The argument also fails because nowhere do appellants identify how this supposed error caused them any prejudice. The Chancellor viewed the conduct of each director individually, and found that no director had breached his or her fiduciary duty of care (as members of the full board) in electing Ovitz as President or (as members of the compensation committee) in determining Ovitz's compensation. If, as appellants now argue, a due care analysis

of the board's conduct must be made collectively, it is incumbent upon them to show how such a collective analysis would yield a different result. The appellants' failure to do that dooms their argument on this basis as well.

(d) HOLDING THAT THE COMPENSATION COMMITTEE MEMBERS DID NOT FAIL TO EXERCISE DUE CARE IN APPROVING THE OEA

The appellants next challenge the Chancellor's determination that although the compensation committee's decision-making process fell far short of corporate governance "best practices," the committee members breached no duty of care in considering and approving the NFT terms of the OEA. That conclusion is reversible error, the appellants claim, because the record establishes that the compensation committee members did not properly inform themselves of the material facts and, hence, were grossly negligent in approving the NFT provisions of the OEA.

The appellants advance five reasons why a reversal is compelled: (i) not all committee members reviewed a draft of the OEA; (ii) the minutes of the September 26, 1995 compensation committee meeting do not recite any discussion of the grounds for which Ovitz could receive a non-fault termination; (iii) the committee members did not consider any comparable employment agreements or the economic impact of extending the exercisability of the options being granted to Ovitz; (iv) Crystal did not attend the September 26, 1995 committee meeting, nor was his letter distributed to or discussed with Poitier and Lozano; and (v) Poitier and Lozano did not review the spreadsheets generated by Watson. These contentions amount essentially to an

73. SUP. CT. R. 8.

attack upon underlying factual findings that will be upheld where they result from the Chancellor's assessment of live testimony.[74]

■ Although the appellants have balkanized their due care claim into several fragmented parts, the overall thrust of that claim is that the compensation committee approved the OEA with NFT provisions that could potentially result in an enormous payout, without informing themselves of what the full magnitude of that payout could be. Rejecting that claim, the Court of Chancery found that the compensation committee members were adequately informed. The issue thus becomes whether that finding is supported by the evidence of record.[75] We conclude that it is.

In our view, a helpful approach is to compare what actually happened here to what would have occurred had the committee followed a "best practices" (or "best case") scenario, from a process standpoint. In a "best case" scenario, all committee members would have received, before or at the committee's first meeting on September 26, 1995, a spreadsheet or similar document prepared by (or with the assistance of) a compensation expert (in this case, Graef Crystal). Making different, alternative assumptions, the spreadsheet would disclose the amounts that Ovitz could receive under the OEA in each circumstance that might foreseeably arise. One variable in that matrix of possibilities would be the cost to Disney of a non-fault termination for each of the five years of the initial term of the OEA. The contents of the spreadsheet would be explained to the committee members, either by the expert who prepared it or by a fellow committee member

similarly knowledgeable about the subject. That spreadsheet, which ultimately would become an exhibit to the minutes of the compensation committee meeting, would form the basis of the committee's deliberations and decision.

Had that scenario been followed, there would be no dispute (and no basis for litigation) over what information was furnished to the committee members or when it was furnished. Regrettably, the committee's informational and decisionmaking process used here was not so tidy. That is one reason why the Chancellor found that although the committee's process did not fall below the level required for a proper exercise of due care, it did fall short of what best practices would have counseled.

The Disney compensation committee met twice: on September 26 and October 16, 1995. The minutes of the September 26 meeting reflect that the committee approved the terms of the OEA (at that time embodied in the form of a letter agreement), except for the option grants, which were not approved until October 16—after the Disney stock incentive plan had been amended to provide for those options. At the September 26 meeting, the compensation committee considered a "term sheet"[76] which, in summarizing the material terms of the OEA, relevantly disclosed that in the event of a non-fault termination, Ovitz would receive: (i) the present value of his salary ($1 million per year) for the balance of the contract term, (ii) the present value of his annual bonus payments (computed at $7.5 million) for the balance of the contract term, (iii) a $10 million termination fee, and (iv) the acceleration of his options for 3 million shares,

---

74. *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del. 1972).

75. *Id.*

76. The term sheet was attached as an exhibit to the September 26 minutes.

which would become immediately exercisable at market price.

Thus, the compensation committee knew that in the event of an NFT, Ovitz's severance payment alone could be in the range of $40 million cash,[77] plus the value of the accelerated options. Because the actual payout to Ovitz was approximately $130 million, of which roughly $38.5 million was cash, the value of the options at the time of the NFT payout would have been about $91.5 million.[78] Thus, the issue may be framed as whether the compensation committee members knew, at the time they approved the OEA, that the value of the option component of the severance package could reach the $92 million order of magnitude if they terminated Ovitz without cause after one year. The evidentiary record shows that the committee members were so informed.

On this question the documentation is far less than what best practices would have dictated. There is no exhibit to the minutes that discloses, in a single document, the estimated value of the accelerated options in the event of an NFT termination after one year. The information imparted to the committee members on that subject is, however, supported by other evidence, most notably the trial testimony of various witnesses about spreadsheets that were prepared for the compensation committee meetings.

The compensation committee members derived their information about the potential magnitude of an NFT payout from two sources. The first was the value of the "benchmark" options previously granted to Eisner and Wells and the valuations by Watson of the proposed Ovitz options. Ovitz's options were set at 75% of parity with the options previously granted to Eisner and to Frank Wells. Because the compensation committee had established those earlier benchmark option grants to Eisner and Wells and were aware of their value, a simple mathematical calculation would have informed them of the potential value range of Ovitz's options. Also, in August and September 1995, Watson and Russell met with Graef Crystal to determine (among other things) the value of the potential Ovitz options, assuming different scenarios. Crystal valued the options under the Black–Scholes method, while Watson used a different valuation metric. Watson recorded his calculations and the resulting values on a set of spreadsheets that reflected what option profits Ovitz might receive, based upon a range of different assumptions about stock market price increases. Those spreadsheets were shared with, and explained to, the committee members at the September meeting.

The committee's second source of information was the amount of "downside protection" that Ovitz was demanding. Ovitz required financial protection from the risk of leaving a very lucrative and secure position at CAA, of which he was a controlling partner, to join a publicly held corporation

**77.** The cash portion of the NFT payout after one year would be the sum of: (i) the present value of Ovitz's remaining salary over the life of the contract (4 years × $1 million/yr = $4 million, reduced to present value), plus (ii) the present value of his unpaid annual bonus payments ($7.5 million/yr × 4 years = $30 million, discounted to present value), plus (iii) $10 million cash for the second tranche of options. These amounts total $44 million before discounting the $34 million of annual salaries and bonuses to present value. The actual cash payment to Ovitz was $38.5 million, which, it would appear, reflects the then-present value of the $34 million of salaries and bonuses.

**78.** Or, if it is assumed that the compensation committee would have estimated the cash portion of an NFT payout after one year at $40 million, then the value of the option portion would have been $90 million.

to which Ovitz was a stranger, and that had a very different culture and an environment which prevented him from completely controlling his destiny. The committee members knew that by leaving CAA and coming to Disney, Ovitz would be sacrificing "booked" CAA commissions of $150 to $200 million—an amount that Ovitz demanded as protection against the risk that his employment relationship with Disney might not work out. Ovitz wanted at least $50 million of that compensation to take the form of an "up-front" signing bonus. Had the $50 million bonus been paid, the size of the option grant would have been lower. Because it was contrary to Disney policy, the compensation committee rejected the up-front signing bonus demand, and elected instead to compensate Ovitz at the "back end," by awarding him options that would be phased in over the five-year term of the OEA.

It is on this record that the Chancellor found that the compensation committee was informed of the material facts relating to an NFT payout. If measured in terms of the documentation that would have been generated if "best practices" had been followed, that record leaves much to be desired. The Chancellor acknowledged that, and so do we. But, the Chancellor also found that despite its imperfections, the evidentiary record was sufficient to support the conclusion that the compensation committee had adequately informed itself of the potential magnitude of the entire severance package, including the options, that Ovitz would receive in the event of an early NFT.

The OEA was specifically structured to compensate Ovitz for walking away from $150 million to $200 million of anticipated commissions from CAA over the five-year OEA contract term. This meant that if Ovitz was terminated without cause, the earlier in the contract term the termination occurred the larger the severance amount would be to replace the lost commissions. Indeed, because Ovitz was terminated after only one year, the total amount of his severance payment (about $130 million) closely approximated the lower end of the range of Ovitz's forfeited commissions ($150 million), less the compensation Ovitz received during his first and only year as Disney's President. Accordingly, the Court of Chancery had a sufficient evidentiary basis in the record from which to find that, at the time they approved the OEA, the compensation committee members were adequately informed of the potential magnitude of an early NFT severance payout.

Exposing the lack of merit in appellants' core due care claim enables us to address more cogently (and expeditiously) the appellants' fragmented subsidiary arguments. First, the appellants argue that not all members of the compensation committee reviewed the then-existing draft of the OEA. The Chancellor properly found that that was not required, because in this case the compensation committee was informed of the substance of the OEA.[79]

Second, appellants point out that the minutes of the September 26 compensation committee meeting recite no discussion of the grounds for which Ovitz could receive a non-fault termination. But the term sheet did include a description of the consequences of a not-for-cause termination, and the Chancellor found that although "no one on the committee recalled any discussion concerning the meaning of gross

79. As the Court found, "the compensation committee was provided with a term sheet of the key terms of the OEA and a presentation was made by Russell (assisted by Watson), who had personal knowledge of the relevant information by virtue of his negotiations with Ovitz and discussions with Crystal." Post-trial Op. at ——, *45.

negligence or malfeasance," those terms "were not foreign to the board of directors, as the language was standard, and could be found, for example, in Eisner's, Wells', Katzenberg's and Roth's employment contracts." [80]

Third, contrary to the appellants' position, the compensation committee members did consider comparable employment agreements. The Chancellor found, as Russell's extensive notes demonstrated, that the comparable historical option grants that Russell analyzed at the September 26 meeting were the grants to Eisner and Wells. The evidence also lays to rest the claim that the compensation committee members did not consider the economic impact of the extended exercisability of the options being granted to Ovitz. Russell and Crystal had assessed the value of those options using the Black–Scholes and other valuation methods during the two weeks preceding the September 26 compensation committee meeting. Russell summarized those analyses at that meeting, and (as earlier discussed) at the time the compensation committee members approved the OEA, they were informed of the magnitude of those values in the event of an NFT.

Fourth, the appellants stress that Crystal did not make a report in person to the compensation committee at its September 26 meeting. Although that is true, it is undisputed that Crystal was available by phone if the committee members had questions that could not be answered by those who were present. Moreover, Russell and Watson related the substance of Crystal's analysis and information to the committee. The Court of Chancery noted (and we agree) that although it might have been the better course of action, it was "not

necessary for an expert to make a formal presentation at the committee meeting in order for the board to rely on that expert's analysis. . . ." [81] Nor did the Chancellor find merit to the appellants' related argument that two committee members, Poitier and Lozano, were not entitled to rely upon the work performed by Russell, Watson and Crystal in August and September 1995, without having first seen all of the written materials generated during that process or having participated in the discussions held during that time. In reaching a contrary conclusion, the Chancellor found:

> The compensation committee reasonably believed that the analysis of the terms of the OEA was within Crystal's professional or expert competence, and together with Russell and Watson's professional competence in those same areas, the committee relied on the information, opinions, reports and statements made by Crystal, even if Crystal did not relay the information, opinions, reports and statements in person to the committee as a whole. Crystal's analysis was not so deficient that the compensation committee would have reason to question it. Furthermore, Crystal appears to have been selected with reasonable care, especially in light of his previous engagements with the Company in connection with past executive compensation contracts that were structurally, at least, similar to the OEA. For all these reasons, the compensation committee also is entitled to the protections of 8 *Del. C.* § 141(e) in relying upon Crystal.[82]

The Chancellor correctly applied Section 141(e) in upholding the reliance of Lozano and Poitier upon the information that Crystal, Russell and Watson furnished to

**80.** *Id.* at ——, *9, n. 81.

**81.** *Id.* at ——, *45.

**82.** *Id.* at ——, *46.

them. To accept the appellants' narrow reading of that statute would eviscerate its purpose, which is to protect directors who rely in good faith upon information presented to them from various sources, including "any other person as to matters the member reasonably believes are within such person's professional or expert competence and who has been selected with reasonable care by and on behalf of the corporation."[83]

Finally, the appellants contend that Poitier and Lozano did not review the spreadsheets generated by Watson at the September 26 meeting. The short answer is that even if Poitier and Lozano did not review the spreadsheets themselves, Russell and Watson adequately informed them of the spreadsheets' contents. The Court of Chancery explicitly found, and the record supports, that Poitier and Lozano "were informed by Russell and Watson of all *material* information reasonably available, even though they were not privy to every conversation or document exchanged amongst Russell, Watson, Crystal, and Ovitz's representatives."[84]

For these reasons, we uphold the Chancellor's determination that the compensation committee members did not breach their fiduciary duty of care in approving the OEA.

### (e) HOLDING THAT THE REMAINING DISNEY DIRECTORS DID NOT FAIL TO EXERCISE DUE CARE IN APPROVING THE HIRING OF OVITZ AS THE PRESIDENT OF DISNEY

The appellants' final claim in this category is that the Court of Chancery erroneously held that the remaining members of the old Disney board[85] had not breached their duty of care in electing Ovitz as President of Disney. This claim lacks merit, because the arguments appellants advance in this context relate to a different subject—the approval of the OEA, which was the responsibility delegated to the compensation committee, not the full board.

 The appellants argue that the Disney directors breached their duty of care by failing to inform themselves of all material information reasonably available with respect to Ovitz's employment agreement. We need not dwell on the specifics of this argument, because in substance they repeat the gross negligence claims previously leveled at the compensation committee—claims that were rejected by the Chancellor and now also by this Court.[86]

---

83. 8 *Del. C.* § 141(e).

84. *Id.* at ——, *46 (emphasis in original). The appellants underscore that neither Poitier or Lozano could recall in their respective testimony, whether they had actually received or reviewed Watson's spreadsheets. The Court of Chancery, however, attributed that lack of recollection to the length of time that had passed since the meeting and credited Watson's testimony that he had shared his spreadsheets with the committee. We will not disturb that credibility determination.

The appellants also contend, in this connection, that Poitier and Lozano were not properly informed because they were not furnished with Crystal's August 26 letter. That letter, however, was based upon Crystal's misunderstanding about the guarantee originally proposed as a feature of the stock options. Once Russell cleared up that misunderstanding, Crystal revised his original letter to comport with the facts and sent the revised letter to Russell and Watson, who then described the revised letter's contents to Poitier and Lozano at the September 26, 1995 meeting.

85. The remaining old board members were Bollenbach, Litvack, Roy Disney, Nunis, Stern, Walker, O'Donovan, Murphy, Gold, Bowers, Wilson and Mitchell.

86. Specifically, the appellants contend that the entire board: (1) did not review or discuss a spreadsheet showing the possible payouts to

The only properly reviewable action of the entire board was its decision to elect Ovitz as Disney's President. In that context the sole issue, as the Chancellor properly held, is "whether [the remaining members of the old board] properly exercised their business judgment and acted in accordance with their fiduciary duties when they elected Ovitz to the Company's presidency." [87] The Chancellor determined that in electing Ovitz, the directors were informed of all information reasonably available and, thus, were not grossly negligent. We agree.

The Chancellor found and the record shows the following: well in advance of the September 26, 1995 board meeting the directors were fully aware that the Company needed—especially in light of Wells' death and Eisner's medical problems—to hire a "number two" executive and potential successor to Eisner. There had been many discussions about that need and about potential candidates who could fill that role even before Eisner decided to try to recruit Ovitz. Before the September 26 board meeting Eisner had individually discussed with each director the possibility of hiring Ovitz, and Ovitz's background and qualifications. The directors thus knew of Ovitz's skills, reputation and experience, all of which they believed would be highly valuable to the Company. The directors also knew that to accept a position at Disney, Ovitz would have to walk away from a very successful business—a reality that would lead a reasonable person to believe that Ovitz would likely succeed in similar pursuits elsewhere in the industry. The directors also knew of the public's highly positive reaction to the Ovitz announcement, and that Eisner and senior management had supported the Ovitz hiring.[88] Indeed, Eisner, who had long desired to bring Ovitz within the Disney fold, consistently vouched for Ovitz's qualifications and told the directors that he could work well with Ovitz.

The board was also informed of the key terms of the OEA (including Ovitz's salary, bonus and options). Russell reported this information to them at the September 26, 1995 executive session, which was attended by Eisner and all non-executive directors. Russell also reported on the compensation committee meeting that had immediately preceded the executive session. And, both Russell and Watson responded to questions from the board. Relying upon the compensation committee's approval of the OEA [89] and the other information furnished to them, the Disney directors, after further deliberating, unanimously elected Ovitz as President.

Based upon this record, we uphold the Chancellor's conclusion that, when electing Ovitz to the Disney presidency the remaining Disney directors were fully informed of all material facts, and that the appellants

---

Ovitz in the event of an NFT; (2) were not given any written materials to review; (3) did not have any report, written or given in person, by a compensation expert; (4) had no idea that the OEA was then the richest pay package ever offered to a corporate officer; and (5) did not discuss the gross negligence or malfeasance standards that would control Ovitz's receipt of an NFT payout.

87. Post-trial Op. at ——, *47.

88. The directors were informed of the reporting structure to which Ovitz had agreed.

That reporting structure resolved Litvack's and Bollenbach's initial personal reaction to being told that Ovitz would be coming to Disney.

89. Contrary to the appellants' assertion (made with no citation of authority), the remaining board members were entitled to rely upon the compensation committee's approval of the OEA, and upon Russell's report of the discussions that occurred at the compensation committee meeting, when considering whether to elect Ovitz as President of Disney. 8 *Del. C.* § 141(e).

failed to establish any lack of due care on the directors' part.

### 2. The Good Faith Determinations

The Court of Chancery held that the business judgment rule presumptions protected the decisions of the compensation committee and the remaining Disney directors, not only because they had acted with due care but also because they had not acted in bad faith. That latter ruling, the appellants claim, was reversible error because the Chancellor formulated and then applied an incorrect definition of bad faith.

In its Opinion the Court of Chancery defined bad faith as follows:

> Upon long and careful consideration, I am of the opinion that the concept of *intentional dereliction of duty, a conscious disregard for one's responsibilities*, is an appropriate (although not the only) standard for determining whether fiduciaries have acted in good faith. Deliberate indifference and inaction *in the face of a duty to act* is, in my mind, conduct that is clearly disloyal to the corporation. It is the epitome of faithless conduct.[90]

The appellants contend that definition is erroneous for two reasons. First they claim that the trial court had adopted a different definition in its 2003 decision denying the motion to dismiss the complaint, and the Court's post-trial (2005) definition materially altered the 2003 definition to appellants' prejudice. Their ar-

gument runs as follows: under the Chancellor's 2003 definition of bad faith, the directors must have *"consciously and intentionally disregarded their responsibilities,* adopting a 'we don't care about the risks' attitude concerning a material corporate decision."[91] Under the 2003 formulation, appellants say, "directors violate their duty of good faith if they are making material decisions without adequate information and without adequate deliberation[,]"[92] but under the 2005 post-trial definition, bad faith requires proof of a subjective bad motive or intent. This definitional change, it is claimed, was procedurally prejudicial because appellants relied on the 2003 definition in presenting their evidence of bad faith at the trial. Without any intervening change in the law, the Court of Chancery could not unilaterally alter its definition and then hold the appellants to a higher, more stringent standard.

▬ Second, the appellants claim that the Chancellor's post-trial definition of bad faith is erroneous substantively. They argue that the 2003 formulation was (and is) the correct definition, because it is "logically tied to board decision-making under the duty of care."[93] The post-trial formulation, on the other hand, "wrongly incorporated substantive elements regarding the rationality of the decisions under review rather than being constrained, as in a due care analysis, to strictly procedural criteria."[94] We conclude that both arguments must fail.[95]

90. Post-trial Op. at ——, *36 (italics in original, footnotes omitted).

91. *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del.Ch.2003) (italics in original).

92. Appellants' Opening Br. at 23.

93. *Id.*

94. *Id.* at 4.

95. The appellants also assert that the Chancellor erred by imposing upon them the burden of proving that the Disney directors acted in bad faith. That argument fails because our decisions clearly hold that for purposes of rebutting the business judgment presumptions, the plaintiffs have the burden of prov-

■ The appellants' first argument—that there is a real, significant difference between the Chancellor's pre-trial and post-trial definitions of bad faith—is plainly wrong. We perceive no substantive difference between the Court of Chancery's 2003 definition of bad faith—a "conscious[ ] and intentional[ ] disregard[ ][of] responsibilities, adopting a 'we don't care about the risks' attitude . . ."—and its 2005 post-trial definition—an "intentional dereliction of duty, a conscious disregard for one's responsibilities." Both formulations express the same concept, although in slightly different language.

The most telling evidence that there is no substantive difference between the two formulations is that the appellants are forced to contrive a difference. Appellants assert that under the 2003 formulation, "directors violate their duty of good faith if they are making material decisions without adequate information and without adequate deliberation." [96] For that *ipse dixit* they cite no legal authority.[97] That comes as no surprise because their verbal effort to collapse the duty to act in good faith into the duty to act with due care, is not unlike putting a rabbit into the proverbial hat and then blaming the trial judge for making the insertion.

The appellants essentially concede that their proof of bad faith is insufficient to satisfy the standard articulated by the Court of Chancery. That is why they ask this Court to treat a failure to exercise due care as a failure to act in good faith. Unfortunately for appellants, that "rule," even if it were accepted, would not help their case. If we were to conflate these two duties and declare that a breach of the duty to be properly informed violates the duty to act in good faith, the outcome would be no different, because, as the Chancellor and we now have held, the appellants failed to establish any breach of the duty of care. To say it differently, even if the Chancellor's definition of bad faith were erroneous, the error would not be reversible because the appellants cannot satisfy the very test they urge us to adopt.

For that reason, our analysis of the appellants' bad faith claim could end at this point. In other circumstances it would. This case, however, is one in which the duty to act in good faith has played a prominent role, yet to date is not a well-developed area of our corporate fiduciary law.[98] Although the good faith concept has recently been the subject of considerable scholarly writing,[99] which includes articles

---

ing bad faith. *Emerald Partners*, 787 A.2d at 91; *Brehm*, 746 A.2d at 264.

**96.** Appellants' Opening Br. at 23.

**97.** The appellants cite only the Chancellor's 2003 pre-trial Opinion (825 A.2d at 289). But nowhere on the cited page does the Court suggest, let alone rule, that making material decisions without adequate information and without adequate deliberation, without more, constitutes bad faith. To the contrary, immediately after identifying the good faith standard, the Court states that "[k]nowing or deliberate indifference by a director to his or her duty to act faithfully and with appropriate care is conduct that, in my opinion, that may not have been taken honestly and in good

faith to advance the best interests of the company." *Id.*

**98.** The Chancellor observed, after surveying the sparse case law on the subject, that both the meaning and the contours of the duty to act in good faith were "[s]hrouded in the fog of . . . hazy jurisprudence." Post–Trial Op. at ——, *35.

**99.** *See, e.g.,* Hillary A. Sale, *Delaware's Good Faith*, 89 Cornell L.Rev. 456 (2004); Matthew R. Berry, *Does Delaware's Section 102(b)(7) Protect Reckless Directors From Personal Liability? Only if Delaware Courts Act in Good Faith*, 79 Wash. L.Rev. 1125 (2004); John L. Reed and Matt Neiderman, *Good Faith and the Ability of Directors to Assert § 102(b)(7) of*

focused on this specific case,[100] the duty to act in good faith is, up to this point relatively uncharted. Because of the increased recognition of the importance of good faith, some conceptual guidance to the corporate community may be helpful. For that reason we proceed to address the merits of the appellants' second argument.

■■■ The precise question is whether the Chancellor's articulated standard for bad faith corporate fiduciary conduct—intentional dereliction of duty, a conscious disregard for one's responsibilities—is legally correct. In approaching that question, we note that the Chancellor characterized that definition as *"an* appropriate *(although not the only)* standard for determining whether fiduciaries have acted in good faith."[101] That observation is accurate and helpful, because as a matter of simple logic, at least three different categories of fiduciary behavior are candidates for the "bad faith" pejorative label.

The first category involves so-called "subjective bad faith," that is, fiduciary conduct motivated by an actual intent to do harm. That such conduct constitutes classic, quintessential bad faith is a proposition so well accepted in the liturgy of fiduciary law that it borders on axiomatic.[102] We need not dwell further on this category, because no such conduct is claimed to have occurred, or did occur, in this case.

■■■ The second category of conduct, which is at the opposite end of the spectrum, involves lack of due care—that is, fiduciary action taken solely by reason of gross negligence and without any malevolent intent. In this case, appellants assert claims of gross negligence to establish breaches not only of director due care but also of the directors' duty to act in good faith. Although the Chancellor found, and we agree, that the appellants failed to establish gross negligence, to afford guidance we address the issue of whether gross negligence (including a failure to

---

the Delaware Corporation Law as a Defense to Claims Alleging Abdication, Lack of Oversight, and Similar Breaches of Fiduciary Duty, 29 DEL. J. CORP. L. 111 (2004); David Rosenberg, *Making Sense of Good Faith in Delaware Corporate Fiduciary Law: A Contractarian Approach,* 29 DEL. J. CORP. L. 491 (2004); Sean J. Griffith, *Good Faith Business Judgment: A Theory of Rhetoric in Corporate Law Jurisprudence,* 55 DUKE L.J. 1 (2005) ("Griffith"); Melvin A. Eisenberg, *The Duty of Good Faith in Corporate Law,* 31 DEL. J. CORP. L. 1 (2005); Filippo Rossi, *Making Sense of the Delaware Supreme Court's Triad of Fiduciary Duties* (June 22, 2005), *available at* http://ssrn.com/abstract=755784; Christopher M. Bruner, *"Good Faith," State of Mind, and the Outer Boundaries of Director Liability in Corporate Law* (Boston Univ. Sch. of Law Working Paper No. 05–19), *available at* http://ssrn.com/abstract=832944; Sean J. Griffith & Myron T. Steele, *On Corporate Law Federalism Threatening the Thaumatrope,* 61 BUS. LAW. 1 (2005)

**100.** *See, e.g.,* Robert Baker, *In Re Walt Disney: What It Means To The Definition Of*

*Good Faith, Exculpatory Clauses, and the Nature of Executive Compensation,* 4 FLA. ST. U. BUS. REV. 261 (2004–2005); Tara L. Dunn, *The Developing Theory of Good Faith In Director Conduct: Are Delaware Courts Ready To Force Corporate Directors To Go Out–Of–Pocket After Disney IV?,* 83 DENV. U.L.REV. 531 (2005).

**101.** Post–Trial Op. at ——, *36 (italics added, italics in original omitted).

**102.** The Chancellor so recognized. *Id.* at ——, *35 ("[A]n action taken with the intent to harm the corporation is a disloyal act in bad faith."). *See McGowan v. Ferro,* 859 A.2d 1012, 1036 (Del.Ch.2004) ("Bad faith is 'not simply bad judgment or negligence,' but rather 'implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.' ") (quoting *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1208, n. 16 (Del.1993)).

inform one's self of available material facts), without more, can also constitute bad faith. The answer is clearly no.

■ From a broad philosophical standpoint, that question is more complex than would appear, if only because (as the Chancellor and others have observed) "issues of good faith are (to a certain degree) inseparably and necessarily intertwined with the duties of care and loyalty...." [103] But, in the pragmatic, conduct-regulating legal realm which calls for more precise conceptual line drawing, the answer is that grossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith. The conduct that is the subject of due care may overlap with the conduct that comes within the rubric of good faith in a psychological sense,[104] but from a legal standpoint those duties are and must remain quite distinct. Both our legislative history and our common law jurisprudence distinguish sharply between the duties to exercise due care and to act in good faith, and highly significant consequences flow from that distinction.

The Delaware General Assembly has addressed the distinction between bad faith and a failure to exercise due care (*i.e.*, gross negligence) in two separate contexts. The first is Section 102(b)(7) of the DGCL, which authorizes Delaware corporations, by a provision in the certificate of incorporation, to exculpate their directors from monetary damage liability for a breach of the duty of care.[105] That exculpatory provision affords significant protection to directors of Delaware corporations. The statute carves out several exceptions, however, including most relevantly, "for acts or omissions not in good faith...." [106] Thus, a corporation can exculpate its directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith. To adopt a definition of bad faith that would cause a violation of the duty of care automatically to become an act or omission "not in good faith," would eviscerate the protections accorded to directors by the General Assembly's adoption of Section 102(b)(7).

A second legislative recognition of the distinction between fiduciary conduct that is grossly negligent and conduct that is not in good faith, is Delaware's indemnification statute, found at 8 *Del. C.* § 145. To oversimplify, subsections (a) and (b) of that statute permit a corporation to indemnify *(inter alia)* any person who is or was a director, officer, employee or agent of the corporation against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement of specified actions, suits or proceedings, where (among other things): (i) that person is, was, or is threatened to be made a party to that action, suit or proceeding, and (ii) that person "acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the

---

**103.** Post-trial Op. at ——, *31 (citing Griffith, *supra* note 99, at 15).

**104.** An example of such overlap might be the hypothetical case where a director, because of subjective hostility to the corporation on whose board he serves, fails to inform himself of, or to devote sufficient attention to, the matters on which he is making decisions as a fiduciary. In such a case, two states of mind coexist in the same person: subjective bad intent (which would lead to a finding of bad faith) and gross negligence (which would lead

to a finding of a breach of the duty of care). Although the coexistence of both states of mind may make them indistinguishable from a psychological standpoint, the fiduciary duties that they cause the director to violate—care and good faith—are legally separate and distinct.

**105.** 8 *Del. C.* § 102(b)(7).

**106.** 8 *Del. C.* § 102(b)(7)(ii).

corporation...."[107] Thus, under Delaware statutory law a director or officer of a corporation can be indemnified for liability (and litigation expenses) incurred by reason of a violation of the duty of care, but not for a violation of the duty to act in good faith.

Section 145, like Section 102(b)(7), evidences the intent of the Delaware General Assembly to afford significant protections to directors (and, in the case of Section 145, other fiduciaries) of Delaware corporations.[108] To adopt a definition that conflates the duty of care with the duty to act in good faith by making a violation of the former an automatic violation of the latter, would nullify those legislative protections and defeat the General Assembly's intent. There is no basis in policy, precedent or common sense that would justify dismantling the distinction between gross negligence and bad faith.[109]

That leaves the third category of fiduciary conduct, which falls in between the first two categories of (1) conduct motivated by subjective bad intent and (2) conduct resulting from gross negligence. This third category is what the Chancellor's definition of bad faith—intentional dereliction of duty, a conscious disregard

for one's responsibilities—is intended to capture. The question is whether such misconduct is properly treated as a non-exculpable, nonindemnifiable violation of the fiduciary duty to act in good faith. In our view it must be, for at least two reasons.

First, the universe of fiduciary misconduct is not limited to either disloyalty in the classic sense (*i.e.*, preferring the adverse self-interest of the fiduciary or of a related person to the interest of the corporation) or gross negligence. Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision. To protect the interests of the corporation and its shareholders, fiduciary conduct of this kind, which does not involve disloyalty (as traditionally defined) but is qualitatively more culpable than gross negligence, should be proscribed. A vehicle is needed to address such violations doctrinally, and that doctrinal vehicle is the duty to act in good faith. The Chancellor implicitly so recognized in his Opinion, where he identified different examples of bad faith as follows:

---

**107.** 8 *Del. C.* §§ 145(a) & (b).

**108.** As we recently stated in *Stifel Financial Corp. v. Cochran,* 809 A.2d 555, 561 (Del. 2002):

The invariant policy of Delaware legislation on indemnification is to "promote the desirable end that corporate officials will resist what they consider unjustified suits and claims, secure in the knowledge that their reasonable expenses will be borne by the corporation they have served if they are vindicated" Folk, on Delaware General Corporation Law sec. 145 (2001). Beyond that, its larger purpose is "to encourage capable men to serve as corporate directors, secure in the knowledge that expenses incurred by them in upholding their

honesty and integrity as directors will be borne by the directors they serve." *Id.*

**109.** Basic to the common law of torts is the distinction between conduct that is negligent (or grossly negligent) and conduct that is intentional. And in the narrower area of corporation law, our jurisprudence has recognized the distinction between the fiduciary duties to act with due care, with loyalty, and in good faith, as well as the consequences that flow from that distinction. Recent Delaware case law precludes a recovery of rescissory (as distinguished from out-of-pocket) damages for a breach of the duty of care, but permits such a recovery for a breach of the duty of loyalty. *See Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1147–1150 (Del.Ch.1994), *aff'd,* 663 A.2d 1156 (Del.1995).

The good faith required of a corporate fiduciary includes not simply the duties of care and loyalty, in the narrow sense that I have discussed them above, but all actions required by a true faithfulness and devotion to the interests of the corporation and its shareholders. A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.[110]

Those articulated examples of bad faith are not new to our jurisprudence. Indeed, they echo pronouncements our courts have made throughout the decades.[111]

Second, the legislature has also recognized this intermediate category of fiduciary misconduct, which ranks between conduct involving subjective bad faith and gross negligence. Section 102(b)(7)(ii) of the DGCL expressly denies money damage exculpation for "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law." By its very terms that provision distinguishes between "intentional misconduct" and a "knowing violation of law" (both examples of subjective bad faith) on the one hand, and "acts ... not in good faith," on the other. Because the statute exculpates directors only for conduct amounting to gross negligence, the statutory denial of exculpation for "acts ... not in good faith" must encompass the intermediate category of misconduct captured by the Chancellor's definition of bad faith.

For these reasons, we uphold the Court of Chancery's definition as a legally appropriate, although not the exclusive, definition of fiduciary bad faith. We need go no further. To engage in an effort to craft (in the Court's words) "a definitive and categorical definition of the universe of acts that would constitute bad faith"[112] would be unwise and is unnecessary to dispose of the issues presented on this appeal.

Having sustained the Chancellor's finding that the Disney directors acted in good

---

**110.** Post-trial Op. at ——, *36 (footnotes omitted).

**111.** See, e.g., Allaun v. Consol. Oil Co., 147 A. 257, 261 (Del.Ch.1929) (further judicial scrutiny is warranted if the transaction results from the directors' "reckless indifference to or a deliberate disregard of the interests of the whole body of stockholders"); Gimbel v. Signal Cos., Inc., 316 A.2d 599, 604 (Del.Ch. 1974), aff'd, 316 A.2d 619 (Del.1974) (injunction denied because, inter alia, there was "[n]othing in the record [that] would justify a finding ... that the directors acted for any personal advantage or out of improper motive or intentional disregard of shareholder interests"); In re Caremark Int'l Derivative Litig., 698 A.2d 959, 971 (Del.Ch.1996) ("only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability."); Nagy v. Bistricer, 770 A.2d 43, 48, n. 2 (Del.Ch.2000) (observing that the utility of the duty of good faith "may rest in its constant reminder ... that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest").

**112.** Post-trial Op. at ——, *36. For the same reason, we do not reach or otherwise address the issue of whether the fiduciary duty to act in good faith is a duty that, like the duties of care and loyalty, can serve as an independent basis for imposing liability upon corporate officers and directors. That issue is not before us on this appeal.

faith when approving the OEA and electing Ovitz as President, we next address the claims arising out of the decision to pay Ovitz the amount called for by the NFT provisions of the OEA.

### B. Claims Arising From The Payment Of The NFT Severance Payout To Ovitz

The appellants advance three alternative claims (each accompanied by assorted subsidiary arguments) whose overall thrust is that even if the OEA approval was legally valid, the NFT severance payout to Ovitz pursuant to the OEA was not. Specifically, the appellants contend that: (1) only the full Disney board with the concurrence of the compensation committee—but not Eisner alone—was authorized to terminate Ovitz; (2) because Ovitz could have been terminated for cause, Litvack and Eisner acted without due care and in bad faith in reaching the contrary conclusion; and (3) the business judgment rule presumptions did not protect the new Disney board's acquiescence in the NFT payout, because the new board was not entitled to rely upon Eisner's and Litvack's contrary advice. Appellants urge that in rejecting these claims the Court of Chancery committed reversible error. We disagree.

### 1. Was Action By The New Board Required To Terminate Ovitz As The President of Disney?

The Chancellor determined that although the board as constituted upon Ovitz's termination (the "new board") had the authority to terminate Ovitz, neither that board nor the compensation committee was required to act, because Eisner also had, and properly exercised, that authority. The new board, the Chancellor

found, was not required to terminate Ovitz under the company's internal documents. Without such a duty to act, the new board's failure to vote on the termination could not give rise to a breach of the duty of care or the duty to act in good faith. Because those are conclusions of law that rest upon the Chancellor's legal construction of Disney's governing instruments, our review of them is plenary.[113]

Article Tenth of the Company's certificate of incorporation in effect at the termination plainly states that:

> The officers of the Corporation shall be chosen in such a manner, shall hold their offices for such terms and shall carry out such duties as are determined solely by the Board of Directors, subject to the right of the Board of Directors to remove any officer or officers at any time with or without cause.[114]

Article IV of Disney's bylaws provided that the Board Chairman/CEO "shall, subject to the provisions of the Bylaws and the control of the Board of Directors, have general and active management, direction, and supervision over the business of the Corporation and over its officers...."[115] From the documents the Court of Chancery concluded (inter alia) that:

> 1) the board of directors has the sole power to elect the officers of the Company; ... 3) the Chairman/CEO has "general and active management, direction and supervision over the business of the Corporation and over its officers," and that such management, direction and supervision is subject to the control of the board of directors; 4) the Chairman/CEO has the power to manage, direct and supervise the lesser officers and employees of the Company; 5) the

---

113. *Kahn v. Lynch Commc'ns Sys.*, 669 A.2d 79, 84 (Del.1995).

114. Post-trial Op. at ——, *48.

115. *Id.*

board has the *right*, but not the *duty* to remove the officers of the Company with or without cause, and that right is non-exclusive; and 6) because that right is non-exclusive, and because the Chairman/CEO is affirmatively charged with the management, direction and supervision of the officers of the Company, together with the powers and duties incident to the office of chief executive, the Chairman/CEO, subject to the control of the board of directors, also possesses the *right* to remove the inferior officers and employees of the corporation.[116]

The issue is whether the Chancellor's interpretation of these instruments, as giving the board and the Chairman/CEO concurrent power to terminate a lesser officer, is legally permissible. In two hypothetical cases there would be a clear answer. If the certificate of incorporation vested the power of removal exclusively in the board, then absent an express delegation of authority from the board, the presiding officer would have not have a concurrent removal power. If, on the other hand, the governing instruments expressly placed the power of removal in both the board and specified officers, then there would be concurrent removal power.[117] This case does not fall within either hypothetical fact pattern, because Disney's governing instruments do not vest the removal power exclusively in the board, nor do they ex-

pressly give the Board Chairman/CEO a concurrent power to remove officers. Read together, the governing instruments do not yield a single, indisputably clear answer, and could reasonably be interpreted either way. For that reason, with respect to this specific issue, the governing instruments are ambiguous.[118]

Where corporate governing instruments are ambiguous, our case law permits a court to determine their meaning by resorting to well-established legal rules of construction,[119] which include the rules governing the interpretation of contracts.[120] One such rule is that where a contract is ambiguous, the court must look to extrinsic evidence to determine which of the reasonable readings the parties intended.[121]

Here, the extrinsic evidence clearly supports the conclusion that the board and Eisner understood that Eisner, as Board Chairman/CEO had concurrent power with the board to terminate Ovitz as President. In that regard, the Chancellor credited the testimony of new board members that Eisner, as Chairman and CEO, was empowered to terminate Ovitz without board approval or intervention; and also Litvack's testimony that during his tenure as general counsel, many Company officers were terminated and the board never once took action in connection with their termi-

---

116. *Id.* at ——, *49 (emphasis in original) (footnotes omitted).

117. *See* FLETCHER, *supra* note 46, at § 357.

118. *Rhone–Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (ambiguity exists "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings").

119. *Investment Assoc. v. Standard Power & Light Corp.*, 48 A.2d 501 (Del.Ch.1946); *aff'd*, 51 A.2d 572 (Del.1947).

120. *Ellingwood v. Wolf's Head Oil Ref. Co.*, 38 A.2d 743 (Del.1944).

121. *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997); *Pellaton v. The Bank of New York*, 592 A.2d 473, 478 (Del.1991); *Harrah's Entertainment, Inc. v. JCC Holding Company*, 802 A.2d 294, 309 (Del. Ch.2002) (applying rule of construction to ambiguous corporate instruments).

nations.[122] Because Eisner possessed, and exercised, the power to terminate Ovitz unilaterally, we find that the Chancellor correctly concluded that the new board was not required to act in connection with that termination, and, therefore, the board did not violate any fiduciary duty to act with due care or in good faith.

As the Chancellor correctly held, the same conclusion is equally applicable to the compensation committee. The only role delegated to the compensation committee was "to establish and approve compensation for Eisner, Ovitz and other applicable Company executives and high paid employees."[123] The committee's September 26, 1995 approval of Ovitz's compensation arrangements "included approval for the termination provisions of the OEA, obviating any need to meet and approve the payment of the NFT upon Ovitz's termination."[124]

Because neither the new board nor the compensation committee was required to take any action that was subject to fiduciary standards, that leaves only the actions of Eisner and Litvack for our consideration. The appellants claim that in concluding that Ovitz could not be terminated "for cause," these defendants did not act

with due care or in good faith. We next address that claim.

2. *In Concluding That Ovitz Could Not Be Terminated For Cause, Did Litvack or Eisner Breach Any Fiduciary Duty?*

■ It is undisputed that Litvack and Eisner (based on Litvack's advice) both concluded that if Ovitz was to be terminated, it could only be without cause, because no basis existed to terminate Ovitz for cause. The appellants argued in the Court of Chancery that the business judgment presumptions do not protect that conclusion, because by permitting Ovitz to be terminated without cause, Litvack and Eisner acted in bad faith and without exercising due care. Rejecting that claim, the Chancellor determined independently, as a matter of fact and law, that (1) Ovitz had not engaged in any conduct as President that constituted gross negligence or malfeasance—the standard for an NFT under the OEA; and (2) in arriving at that same conclusion in 1996, Litvack and Eisner did not breach their fiduciary duty of care or their duty to act in good faith.

The appellants now urge that those rulings constitute reversible error. To the extent the trial court's rulings are legal,

---

122. Post-trial Op. at ——, *49, n. 571, 572. Nonetheless, the board was informed of, and supported, Eisner's decision.

123. *Id.* at ——, *49.

124. *Id.* To support their argument that the compensation committee's approval of the Ovitz termination was required, appellants point to a provision of the Option Plan giving the compensation committee "the sole power to make determinations regarding the termination of any participant's employment," including "the cause[s] therefor and the consequences thereof." That provision, however, is expressly limited by the language "or as otherwise may be provided by the [Compensation] Committee." Here, the compensation committee approved the OEA, which con-

tained its own termination provisions and standards. Section 11 of the OEA provided that "the Company" shall determine if cause exists for a termination. The OEA does not purport to delegate any authority to the compensation committee to make such a determination. The Chancellor recognized that although the foregoing reasoning might not be dispositive, the limiting language of the Option Plan was "sufficiently ambiguous—as to whether action by the compensation committee is required in all terminations . . . of employees who possess options—to, in my opinion, absolve . . . the compensation committee for not acting with respect to Ovitz's termination." *Id.* at ——, *50.

we review them *de novo,* to the extent they involve factual findings based upon determinations of witness credibility, we will uphold them;[125] and to the extent a factual finding is based on an expert opinion, it "may be overturned only if arbitrary or lacking any evidentiary support."[126] Measured by these standards of review, the appellants have failed to establish error of any kind.

In determining independently that Ovitz could not have been fired for cause, the Chancellor held:

> ... I conclude that given his performance, Ovitz could not have been fired for cause under the OEA. Any early termination of his employment, therefore, had to be in the form of an NFT. In reaching this conclusion, I rely on the expert reports of both [Larry] Feldman and [John] Fox, whose factual assumptions are generally consonant with my factual findings above. Nevertheless, by applying the myriad of definitions for gross negligence and malfeasance discussed by [John] Donohue, Feldman and Fox, I also independently conclude, based upon the facts as I have found them, that Ovitz did not commit gross negligence or malfeasance while serving as the Company's President.[127]

The appellants challenge this conclusion on two grounds: (1) that the trial court did not articulate its understanding of the good cause determination; and (2) the court did not cite any facts to support its findings. Neither argument is correct.

The Court of Chancery considered (even though it did not accept all of) the definitions of gross negligence and malfeasance advanced by trial experts Feldman, Donohue and Fox. Based upon the facts as found by the Court, the Chancellor concluded that under *all* the myriad definitions discussed by those experts, Ovitz did not commit gross negligence. The appellants have not shown that the Court of Chancery relied arbitrarily upon the definitions advanced by these experts. Nor could they, because the appellants' true quarrel is with the factual findings that underlie the Court's legal conclusion. The appellants are unable, however, to show that those findings, all of which are based on extensive trial testimony, witness credibility determinations, and highly textured treatment in the Post-trial Opinion, are in any way wrong.

At the trial level, the appellants attempted to show, as a factual matter, that Ovitz's conduct as President met the standard for a termination for cause, because (i) Ovitz intentionally failed to follow Eisner's directives and was insubordinate, (ii) Ovitz was a habitual liar, and (iii) Ovitz violated Company policies relating to expenses and to reporting gifts he gave while President of Disney. The Court found the facts contrary to appellants' position. As to the first accusation, the Court found that many of Ovitz's efforts failed to produce results "often because his efforts reflected an opposite philosophy than that held by Eisner, Iger, and Roth. This does not mean that Ovitz intentionally failed to follow Eisner's directives or that he was insubordinate."[128] As to the second, the Court found that:

> In the absence of any concrete evidence that Ovitz told a material falsehood during his tenure at Disney, plaintiffs fall back on alleging that Ovitz's disclosures regarding his earn-out with, and past

**125.** *Hudak,* 806 A.2d at 151, n. 28.

**126.** *Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137, 1146 (Del.1989).

**127.** Post-trial Op. at ——, *39.

**128.** *Id.* at ——, *14.

income from, CAA, were false or materially misleading. As a neutral fact-finder, I find that the evidence simply does not support either of those assertions.[129] And, as to the third accusation, the Court found "that Ovitz was not in violation of The Walt Disney Company's policies relating to expenses or giving and receiving gifts."[130] Accordingly, the appellants' claim that the Chancellor incorrectly determined that Ovitz could not legally be terminated for cause lacks any factual foundation.

Despite their inability to show factual or legal error in the Chancellor's determination that Ovitz could not be terminated for cause, appellants contend that Litvack and Eisner breached their fiduciary duty to exercise due care and to act in good faith in reaching that same conclusion. The Court of Chancery scrutinized the record to determine independently whether, in reaching their conclusion, Litvack and Eisner had separately exercised due care and acted in good faith. The Court determined that they had properly discharged both duties. Appellants' attack upon that determination lacks merit, because it is also without basis in the factual record.

After considering the OEA and Ovitz's conduct, Litvack concluded, and advised Eisner, that Disney had no basis to terminate Ovitz for cause and that Disney should comply with its contractual obligations. Even though Litvack personally did not want to grant a NFT to Ovitz, he concluded that for Disney to assert falsely that there was cause would be both unethical and harmful to Disney's reputation. As to Litvack, the Court of Chancery held:

> I do not intend to imply by these conclusions that Litvack was an infallible source of legal knowledge. Neverthe-

less, Litvack's less astute moments as a legal counsel do not impugn his good faith or preparedness in reaching his conclusions with respect to whether Ovitz could have been terminated for cause. . . .

\* \* \*

> In conclusion, Litvack gave the proper advice and came to the proper conclusions when it was necessary. He was adequately informed in his decisions, and he acted in good faith for what he believed were the best interests of the Company.[131]

With respect to Eisner, the Chancellor found that faced with a situation where he was unable to work well with Ovitz, who required close and constant supervision, Eisner had three options: 1) keep Ovitz as President and continue trying to make things work; 2) keep Ovitz at Disney, but in a role other than as President; or 3) terminate Ovitz. The first option was unacceptable, and the second would have entitled Ovitz to the NFT, or at the very least would have resulted in a costly lawsuit to determine whether Ovitz was so entitled. After an unsuccessful effort to "trade" Ovitz to Sony, that left only the third option, which was to terminate Ovitz and pay the NFT. The Chancellor found that in choosing this alternative, Eisner had breached no duty and had exercised his business judgment:

> . . . I conclude that Eisner's actions in connection with the termination are, for the most part, consistent with what is expected of a faithful fiduciary. Eisner unexpectedly found himself confronted with a situation that did not have an easy solution. He weighed the alterna-

---

**129.** *Id.* at ——, *15.

**130.** *Id.* at ——, *16.

**131.** *Id.* at ——, *50.

tives, received advice from counsel and then exercised his business judgment in the manner he thought best for the corporation. Eisner knew all the material information reasonably available when making the decision, he did not neglect an affirmative duty to act (or fail to cause the board to act) and he acted in what he believed were the best interests of the Company, taking into account the cost to the Company of the decision and the potential alternatives. Eisner was not personally interested in the transaction in any way that would make him incapable of exercising business judgment, and I conclude that the plaintiffs have not demonstrated by a preponderance of the evidence that Eisner breached his fiduciary duties or acted in bad faith in connection with Ovitz's termination and receipt of the NFT.[132]

These determinations rest squarely on factual findings that, in turn, are based upon the Chancellor's assessment of the credibility of Eisner and other witnesses. Even though the Chancellor found much to criticize in Eisner's "imperial CEO" style of governance, nothing has been shown to overturn the factual basis for the Court's conclusion that, in the end, Eisner's conduct satisfied the standards required of him as a fiduciary.[133]

3. *Were The Remaining Directors Entitled To Rely Upon Eisner's And Litvack's Advice That Ovitz Could Not Be Fired For Cause?*

The appellants' third claim of error challenges the Chancellor's conclusion that the remaining new board members could rely

upon Litvack's and Eisner's advice that Ovitz could be terminated only without cause. The short answer to that challenge is that, for the reasons previously discussed, the advice the remaining directors received and relied upon was accurate. Moreover, the directors' reliance on that advice was found to be in good faith. Although formal board action was not necessary, the remaining directors all supported the decision to terminate Ovitz based on the information given by Eisner and Litvack. The Chancellor found credible the directors' testimony that they believed that Disney would be better off without Ovitz, and the appellants offer no basis to overturn that finding.

\* \* \* \*

To summarize, the Court of Chancery correctly determined that the decisions of the Disney defendants to approve the OEA, to hire Ovitz as President, and then to terminate him on an NFT basis, were protected business judgments, made without any violations of fiduciary duty. Having so concluded, it is unnecessary for the Court to reach the appellants' contention that the Disney defendants were required to prove that the payment of the NFT severance to Ovitz was entirely fair.

### V. THE WASTE CLAIM

The appellants' final claim is that even if the approval of the OEA was protected by the business judgment rule presumptions, the payment of the severance amount to Ovitz constituted waste. This claim is rooted in the doctrine that a plaintiff who

---

132. *Id.* at ——, *51

133. Although the appellants continue to argue as fact that Eisner allowed Ovitz to receive an NFT as an act of friendship, the Chancellor found that Eisner did not want Ovitz to receive that payment. *Id.* at ——, *20 ("Despite

the paucity of evidence, it is clear to the Court that both Eisner and Litvack wanted to fire Ovitz for cause to avoid the costly NFT payment, and perhaps out of personal motivations."). Appellants offer no tenable basis to overturn that finding.

fails to rebut the business judgment rule presumptions is not entitled to any remedy unless the transaction constitutes waste.[134] The Court of Chancery rejected the appellants' waste claim, and the appellants claim that in so doing the Court committed error.

■■■ To recover on a claim of corporate waste, the plaintiffs must shoulder the burden of proving that the exchange was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."[135] A claim of waste will arise only in the rare, "unconscionable case where directors irrationally squander or give away corporate assets."[136] This onerous standard for waste is a corollary of the proposition that where business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be "attributed to any rational business purpose."[137]

■■■ The claim that the payment of the NFT amount to Ovitz, without more, constituted waste is meritless on its face, because at the time the NFT amounts were paid, Disney was contractually obligated to pay them. The payment of a contractually obligated amount cannot constitute waste, unless the contractual obligation is itself wasteful. Accordingly, the proper focus of a waste analysis must be whether the amounts required to be paid in the event of an NFT were wasteful *ex ante*.

Appellants claim that the NFT provisions of the OEA were wasteful because they incentivized Ovitz to perform poorly in order to obtain payment of the NFT provisions. The Chancellor found that the record did not support that contention:

> [T]erminating Ovitz and paying the NFT did not constitute waste because he could not be terminated for cause and because many of the defendants gave credible testimony that the Company would be better off without Ovitz, meaning that would be impossible for me to conclude that the termination and receipt of NFT benefits result in "an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration," or a situation where the defendants have "irrationally squandered or given away corporate assets." In other words, defendants did not commit waste.[138]

That ruling is erroneous, the appellants argue, because the NFT provisions of the OEA were wasteful in their very design. Specifically, the OEA gave Ovitz every incentive to leave the Company before serving out the full term of his contract. The appellants urge that although the OEA may have induced Ovitz to join Disney as President, no contractual safeguards were in place to retain him in that position. In essence, appellants claim that the NFT provisions of the OEA created an irrational incentive for Ovitz to get himself fired.[139]

134. *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780 (Del.Ch.1988).

135. *Brehm*, 746 A.2d at 263.

136. *Id.*

137. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971); *see also Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985).

138. Post-trial Op. at ——, *39.

139. The appellants also claim, because the Disney defendants had a rational basis to fire Ovitz for cause, the NFT payment to Ovitz constituted an unnecessary gift of corporate assets to Eisner's friend. Because we affirm the Court of Chancery's legal determination that no cause existed to terminate Ovitz, that claim lacks merit on its face.

That claim does not come close to satisfying the high hurdle required to establish waste. The approval of the NFT provisions in the OEA had a rational business purpose: to induce Ovitz to leave CAA, at what would otherwise be a considerable cost to him, in order to join Disney.[140] The Chancellor found that the evidence does not support any notion that the OEA irrationally incentivized Ovitz to get himself fired.[141] Ovitz had no control over whether or not he would be fired, either with or without cause. To suggest that at the time he entered into the OEA Ovitz would engineer an early departure at the cost of his extraordinary reputation in the entertainment industry and his historical friendship with Eisner, is not only fanciful but also without proof in the record. Indeed, the Chancellor found that it was "patently unreasonable to assume that Ovitz intended to perform just poorly enough to be fired quickly, but not so poorly that he could be terminated for cause." [142]

We agree. Because the appellants have failed to show that the approval of the NFT terms of the OEA was not a rational business decision, their waste claim must fail.

## VI. *CONCLUSION*

For the reasons stated above, the judgment of the Court of Chancery is affirmed.

---

140. *See Kerbs v. California Eastern Airways,* 90 A.2d 652, 656 (Del.1952) ("Sufficient consideration to the corporation may be, *inter alia,* the retention of the services of an employee, or the gaining of the services of a new employee, provided there is a reasonable relationship between the value of the services to be rendered by the employee and the value of the options granted as an inducement or compensation.").

141. Indeed, all the credible evidence supports the Chancellor's conclusion that Ovitz resisted, at every turn, all suggestions, communicated directly or indirectly by Eisner, that Ovitz leave Disney.

142. Post-trial Op. at ——, *38.