UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-1587

MARTEK BIOSCIENCES CORPORATION,

Plaintiff - Appellee,

versus

ROBERT ZUCCARO, as Stockholders'
Representative of the former Interest Holders
of OmegaTech, Inc.,

Defendant - Appellant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore. Andre M. Davis, District Judge. (1:04-cv-
03349-AMD)

Argued: May 24, 2007                    Decided:  July 17, 2007

Before NIEMEYER and DUNCAN, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

Vacated and remanded by unpublished opinion.  Judge Niemeyer wrote
the opinion, in which Judge Duncan and Senior Judge Hamilton
joined.

**ARGUED:** J. Clifford Gunter, III, BRACEWELL & GIULIANI, L.L.P.,
Houston, Texas, for Appellant.  Mark D. Gately, HOGAN & HARTSON,
L.L.P., Baltimore, Maryland, for Appellee.  **ON BRIEF:** Andrew M.
Edison, BRACEWELL & GIULIANI, L.L.P., Houston, Texas; Shelby J.
Kelley, BRACEWELL & GIULIANI, L.L.P., Washington, D.C., for
Appellant.  Lauren S. Colton, HOGAN & HARTSON, L.L.P., Baltimore,
Maryland; Catherine E. Stetson, HOGAN & HARTSON, L.L.P.,
Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

Under the terms of a March 2002 merger agreement between Martek Biosciences Corporation and OmegaTech, Inc. -- two manufacturers of "DHA," a type of long-chain fatty acid thought to be good for cardiovascular health -- Martek agreed to pay OmegaTech shareholders an additional $10 million in Martek stock if and when each of four "milestones" was achieved after the date of the merger agreement. One such milestone, which is at issue in this case, would be achieved if the National Academy of Sciences published an authoritative statement recommending a "dietary reference intake" of DHA that would permit an application to the United States Food and Drug Administration ("FDA") for a "nutrient content claim on food labels," so that upon approval of the application, Martek's customers could advertise the presence of DHA in their products.

The National Academy of Sciences in fact published a report, which came after the date of the merger agreement, but it stopped short of setting a precise dietary target for DHA. The report did, however, endorse DHA as contributing to the proper intake of a short-chain fatty acid, "LNA," leading OmegaTech's former shareholders to request payment under the milestone. When Martek and the OmegaTech shareholders could not agree whether the National Academy of Sciences' report sufficiently recommended DHA to satisfy the milestone requirements, they decided to seek regulatory approval for the product claims based on the report, on the theory

that FDA approval would signal that the milestone had been achieved. Even though the FDA approved the product claims, the parties still could not agree whether Martek owed the OmegaTech stockholders the $10 million for satisfaction of the milestone. Martek commenced this action for a declaratory judgment that the milestone had not been achieved, and the former OmegaTech shareholders through their appointed representative, Robert Zuccaro, counterclaimed for breach of contract.

On Martek's motion for summary judgment, the district court ruled that the milestone had not been achieved, entering a declaratory judgment that Martek had no duty to pay the additional $10 million. We conclude, however, that the language of the contractual milestone is ambiguous and that the district court must therefore assess, as a factual matter, the intentions and purposes of the parties to the bargain and whether Martek received the benefit of the bargain. Accordingly, we vacate the summary judgment and remand for further proceedings.

I

Prior to the merger, both Martek and OmegaTech manufactured DHA (docosahexaenoic acid) from algae that naturally produce that type of long-chain fatty acid. DHA is used as a dietary supplement, in baby formula, and as a food additive.

Under the merger agreement between Martek and OmegaTech, dated March 25, 2002, Martek agreed to pay OmegaTech's stockholders approximately $50 million in Martek stock. It also agreed to pay an additional $10 million in stock for each of four "milestones" that was achieved during an "earn-out period" -- the period between March 25, 2002, and October 30, 2004. Two of the milestones related to financial performance, recognizing that OmegaTech would be worth more if the combined companies sold an increased amount of product in the two years after the merger. The other two milestones related to regulatory approval of claims that could be made about DHA on food packages. The milestone at issue in this case is the "nutrient content claim milestone," which rewarded potential FDA regulatory action permitting certain types of claims about DHA on product packages.

The parties recognize that OmegaTech would have greater value if customers of the combined companies could make certain types of "nutrient content claims" on their product packages, such as "this product contains DHA" or "this product contains 32 milligrams of DHA, 20% of a daily value." The ability to make such claims was an important business goal because "it would be extremely difficult, if not impossible, to sign major food companies to DHA licensing deals unless DHA could be promoted on food labels."

The language of the milestone, keyed to compliance with and the language of the Food and Drug Administration Modernization Act, reads as follows:

> If the <u>National Academy of Sciences</u> (the "NAS"), at any time during the Earn-Out Period, makes an <u>authoritative statement</u> recommending a <u>Dietary Reference Intake</u> (a "Recommendation"), including, without limitation, a Recommended Daily Intake or any Adequate Intake, citing a specific milligram <u>level</u> for the long-chain fatty acid[] [DHA] that permits <u>application to the U.S. Food and Drug Administration</u>, pursuant to the Food and Drug Administration Modernization Act, for a <u>nutrient content claim</u> on food labels for [DHA], provided, however, that this nutrient content claim must be limited to [DHA] and shall specifically not include the short chain omega-3 fatty acid alpha-linolenic acid ("LNA"), such numbers of shares of Martek Common Stock equal to $10 million . . . shall be distributed to the Interest Holders.

<u>Cf.</u> 21 U.S.C. § 343(r) (with respect to the emphasized terms).

The parties initially crafted the language of the milestone to depend on the FDA's <u>approval</u> of a nutrient content claim for DHA. They abandoned that concept, however, because FDA approval would take too long and the merging parties did not believe that Martek would be able to obtain FDA authorization based on the then-existing science. Therefore, they linked the $10 million milestone payment to the <u>publication</u> of a scientific statement sufficient to permit regulatory approval of nutrition claims for DHA -- in the language of the statute, an "authoritative statement" sufficient for FDA approval. The agreement thus set achievement of the milestone at a time earlier in the regulatory process than actual FDA approval of a nutrient content claim.

Also important to the merging parties was the right to make a freestanding nutrient content claim with respect to DHA, a long-chain fatty acid, as distinct from LNA (alpha-linolenic acid), a short-chain fatty acid. If the nutrient content claim for DHA had to be tied to a claim for LNA, it would be of less commercial value to the parties. LNA was substantially cheaper than DHA, and Martek lacked a competitive edge in making LNA.

Thus, at a high level of generality, the milestone would be achieved when a scientific statement was published that was sufficient to support an application to the FDA for approval of a nutrient content claim for DHA, independent of LNA.

On September 5, 2002, a division of the National Academy of Sciences issued a pre-publication draft of a report entitled "Dietary Reference Intakes" (hereafter "Report"), which set dietary reference intakes for certain food components, including fatty acids. The Report, which the OmegaTech stockholders contended qualified as the "authoritative statement" of the milestone, stated:

> Because of a lack of evidence for determining the requirement for n-3 fatty acids, an [Adequate Intake] is set based on the highest median intake of [short-chain LNA] by adults in the United States where a deficiency is basically nonexistent in free-living populations . . . . Small amounts of [long-chain DHA] can contribute towards reversing an n-3 fatty acid efficiency . . . . [DHA] can contribute up to 10 percent of the total n-3 fatty acid intake and therefore up to this percent can contribute towards the [Adequate Intake] for [LNA].

-7-

Martek, however, did not agree that the Report was adequate. To resolve the question whether this statement satisfied the milestone, the OmegaTech stockholders (through Zuccaro) offered to file a notification with the FDA for nutrient content claims for DHA, on the theory that FDA approval of the nutrient content claims would be strong evidence that the milestone was met. Martek agreed with this course of action. The OmegaTech stockholders, as part of a group of DHA manufacturers, applied for approval from the FDA in January 2004 by submitting to the FDA a "notification" of the specific nutrient content claims for DHA they wanted, basing these claims on the Report. Under the FDA's process, the FDA could have approved the submitted claims, as contained in the notification, or it could have allowed 120 days to elapse without disapproving the claims, see 21 U.S.C. § 343(r)(2)(H), in which case the claims would be approved by operation of law.

FDA let the 120 days elapse, and on May 15, 2004, the DHA manufacturers were free to make the nutrient content claims contained in the notification. Consistent with this approval, the FDA placed a notice of the claims on a public docket.

Unsatisfied by the nutrient content claims of this notification, Martek itself filed a nutrient content claim notification in January 2005 for different claims, again based on the Report. According to a Martek nutritionist who worked on drafting the notification, an approval of these nutrient content

-8-

claims "would probably satisfy the milestone" in the merger agreement. The Martek notification represented that the Report was an authoritative statement and that the nutrient content claims for DHA met the FDA requirements, as a recommended level of DHA could be derived from the Report.

Again the FDA approved the Martek notification by allowing the 120 days to pass without comment, and by operation of law, manufacturers were then permitted to make the nutrient content claims for DHA (without referring to LNA), as claimed in the Martek notification. Again, the FDA placed a notice on the public docket for the allowed claims.

To date, the FDA has left in place the nutrient content claims contained in both OmegaTech's notification and Martek's notification and has approved, in addition, a Martek petition, based in part on the Report, to make health claims for DHA (more potent claims than simple nutrient content claims).

When the parties failed to agree thereafter on whether the milestone in the merger agreement had been met, Martek commenced this action for a declaratory judgment and moved for summary judgment declaring that the milestone had not been met. In granting Martek's motion, the district court held that the milestone had not been achieved because (1) "[T]he merger agreement specifically requires that [a National Academy of Sciences] endorsement of [DHA] come unattached to a recommendation on LNA

-9-

. . . [T]his is not the case"; and (2) the Report did not cite a "specific milligram level" for DHA.[1]  From the district court's judgment, the OmegaTech stockholders, through Zuccaro, filed this appeal.

II

Delaware law, which applies in this diversity action by reason of the merger agreement's choice of law provision, requires that the text of a contract be applied if its meaning is clear.  But if the text is ambiguous, the court "will consider testimony pertaining to antecedent agreements, communications and other factors which bear on the proper interpretation of the contract." Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991).

The district court found the text of the milestone provision clear and applied the clear meaning to grant Martek summary judgment.  It based its conclusion on two reasons.  First, it held that "the merger agreement specifically requires that [a National Academy of Sciences] endorsement of [DHA] come unattached to a recommendation on LNA" and that the Report's endorsement of DHA did not come unattached to a recommendation on LNA.  The court's reasoning, however, misreads the milestone provision.  The

---

[1]The district court did not reach Martek's two other arguments why the milestone was not achieved -- that the Report did not contain "authoritative statements" and that the Report did not "permit application" for a nutrient content claim for DHA. Nonetheless, we find these arguments to be without merit.

-10-

provision does not require that the National Academy of Sciences' recommendation on DHA come unattached to a recommendation on LNA. Rather, it requires that the nutrient content claim for DHA not include LNA. The parties bargained for the sort of recommendation that would reasonably support a nutrient content claim for DHA, which is why the decoupling of DHA and LNA was only required in the nutrient content claim, not the recommendation supporting that claim. With the text as written, the district court would have been required to determine whether the recommendation was sufficient to support a freestanding nutrient content claim for DHA.

Second, the district court held that the "[Report] does not 'cite a specific milligram level' that it recommended for [DHA] that could be applied to a nutrient content claim." Because the Report gave a range of intakes for DHA consistent with good health, there was no "specific milligram level." "Whereas the parties, by the nutritional milestone, sought a declaration of the level of DHA that a person should take, what they got from the [Report] was an upper limit of how much someone could take. In this (material) sense, the nutritional milestone is not met." In making this holding, the court construed an ambiguous term, resolving the ambiguity to reach one chosen result. The same language, however, equally supports the conclusion that the Report did cite specific milligram levels for DHA.

-11-

The Report cited a specific milligram level for the short-chain fatty acid LNA, giving a level, for example, of 1600 milligrams per day for adult men. It then proceeded to state that up to 10% of that milligram level for LNA could be achieved by consuming DHA. Thus, the Report could be read to say that 160 milligrams of DHA could, for adult men, help achieve the health benefits suggested by the Report. While some levels could to this extent be derived from the Report for DHA, the question remained whether they were the type of levels bargained for by the parties.

The parties focus on the semantics of whether the "range" cited by the Report can include a "specific milligram level." The OmegaTech stockholders rely on a dictionary definition of "range," noting that the term means a "series extending between certain limits." They argue accordingly that the Report's citing of a range is tantamount to citing a series of acceptable levels. Martek responds by arguing that because the Report's range was consistent with zero consumption of DHA, the Report contains no "precise numeric value."[2] Both of these arguments are based on abstract understandings of the meaning of the word "level" and whether citing a range is equivalent to citing a level. In a particular setting, however, each might be correct in light of a

_____

[2]Martek does not on appeal defend the district court's distinction between a statement of how much DHA a person "should" take and a statement of how much DHA a person "could" take. Neither the parties' agreement nor the industry practices seem to assign relevance to this distinction.

-12-

particular purpose.  Nothing on the face of the contract indicates which of these specific meanings the drafters had in mind.  Indeed, the drafters appear to have focused on <u>any</u> level "that permits application . . . for a nutrient content claim on food labels." The proper definition of the term therefore depends not only on an abstract linguistic analysis, but also on the commercial purpose of the milestone provision.  And determining that purpose requires an examination of extrinsic evidence of the parties' intent.

The milestone provision also includes a structural ambiguity. It provides that the OmegaTech stockholders would receive an additional $10 million if (1) the National Academy of Sciences issued an "authoritative statement," (2) recommending a "dietary reference intake," (3) citing a "specific milligram level," (4) that "permits application" to the FDA for a "nutrient content claim" for DHA.  Structurally, the provision identifies three criteria for the Report (items 1, 2, and 3), and one goal of the milestone (item 4).  As a whole, the provision appears to be aimed at rewarding OmegaTech's stockholders when the <u>forward-looking</u> criteria reasonably suggest that a nutrient content claim for DHA could be expected to be approved by the FDA.  But in this case, we need not look forward to see whether a nutrient content claim could reasonably be expected to be approved, because we can look <u>backward</u> and see that a nutrient content claim was indeed approved by the FDA, no less than three times.  Because the milestone is phrased as

-13-

if it will be evaluated after the issuance of the Report but before any FDA action, it does not provide guidance as to how, or even whether, the criteria were to be evaluated once the FDA had approved a nutrient content claim. The milestone provision is thus ambiguous, because not all reasonable readers of the contract would conclude that the criteria are freestanding contractual requirements rather than proxies for an ultimate goal, which we now know has been accomplished.[3]

Because the milestone provision is ambiguous, the responsibility for the courts is to find the intent of the parties, relying on whatever evidence sheds light on that intent. See Comrie v. Enterasys Networks, Inc., 837 A.2d 1, 13 (Del. Ch. 2003) (holding that when a contract's terms are ambiguous, "the court may consider extrinsic evidence to uphold, to the extent possible, the reasonable shared expectations of the parties at the time of contracting"); accord Seaford Golf & Country Club v. E.I. duPont de Nemours & Co., 2007 Del. LEXIS 221, at *20-*22 (Del. May 15, 2007); Eagle Indus. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232-33 (Del. 1997).

---

[3]It is possible that the only reasonable reading of the contractual purpose is the OmegaTech stockholders' position. But we leave this issue for further development. We also leave open the issue of whether Martek, by virtue of its representations to the FDA in its nutrient content claim notification, should be judicially estopped from asserting that the milestone was not achieved.

-14-

In sum, the ambiguities in the milestone provision require factfinding as to what precisely the parties bargained for and whether Martek has received the benefit of that bargain. See Brehm v. Eisner, 906 A.2d 27, 69 (Del. 2006).

### III

Because we find the relevant milestone provision ambiguous, we proceed to determine whether the OmegaTech stockholders have presented enough extrinsic evidence to create a question of fact about the parties' shared intent and therefore to defeat Martek's motion for summary judgment.

Taking the evidence in the light most favorable to the OmegaTech stockholders, the record supports the conclusions that the purpose of the milestone provision was to reward OmegaTech's stockholders for the ability to make nutrient content claims and that Martek has therefore received the benefit of the bargain. Because the parties wanted a shorter earn-out period than would be needed to await final FDA approval of a nutrient content claim, the milestone was keyed to publication of a report reasonably calculated to support approval of a nutrient content claim. This is supported by the milestone's tracking of the statutory terms governing FDA approval of nutrient content claims, as well as the explicit allusion to a report that "permits application to the [FDA] pursuant to the Food and Drug Administration Modernization

Act." Compare J.A. 120-21 ("If the National Academy of Sciences . . . makes an authoritative statement") with 21 U.S.C. § 343(r)(2)(G)(I) ("the National Academy of Sciences or any of its subdivisions has published an authoritative statement"); compare J.A. 120-21 ("citing a specific milligram level") with 21 U.S.C. § 343(r)(2)(G)(I) ("which identifies the nutrient level to which the claim refers"). The reference to and use of the statutory language reflects a single purpose of obtaining permission to make nutrient content claims relating to DHA. Thus, in the light most favorable to OmegaTech stockholders, the approval of the nutrient content claim would prove a fortiori that the recommendation was sufficient to meet the business goals of the merger agreement.

Parol evidence likewise suggests that the milestone was simply intended to reward the ability to make nutrient content claims, a reward well-earned in view of the FDA's actions. For example, Kent Meager, former chairman of the board of OmegaTech, testified in deposition that:

> I recall being delighted by some of its language, specifically the language permits, because there was concern associated with the timing of actually getting a nutrient content claim, what I considered to be the ultimate objective of the milestone.

*     *     *

> [The milestone] changed to simply not have as the objective a filed and allowed nutrient content claim, but simply the permission or permitted notification slash, as this is termed, application.

*     *     *

-16-

It was basically saying that if the report came out with something that distinguished DHA such that you could make -- and had a recommendation -- such that you can make a notification under FDAMA for a nutrient content claim, that rather than having us wait through the process of will the FDA grant it or not, that we would -- the milestone would be considered achieved and the shares would be distributed.

(Emphasis added). Robert Di Scipio, former general counsel of OmegaTech, testified similarly by affidavit:

While OmegaTech realized the importance of securing a Nutrient Content Claim for [DHA] for Martek, OmegaTech did not want to wait two to three years until a Nutrient Content Claim was achieved under the FDAMA procedures to receive payment on the Nutrient Content Claim Milestone.

Martek's CFO, Pete Buzy, indicated that he also did not want to wait until a Nutrient Content Claim was achieved to pay off the Nutrient Content Claim Milestone, because he did not want the Martek shares escrowed for the milestones to be outstanding for that long.

The Martek and OmegaTech negotiators agreed that the milestone should be paid if it appeared that a Nutrient Content Claim for [DHA] could be secured. Both companies agreed that the Nutrient Content Claim Milestone would be deemed achieved if an anticipated [Report] contained a statement regarding [DHA] that would simply <u>permit</u> application for a [DHA] nutrient content claim so that OmegaTech shareholders would be paid <u>before</u> the FDAMA process even got underway. Accordingly, OmegaTech and its shareholders would not be waiting for payment on the Nutrient Content Claim Milestone while the notification worked through the system.

\*     \*     \*

At all times during the negotiations, the intended purpose of the Nutrient Content Claim Milestone, . . . , was to achieve a Nutrient Content Claim for [DHA] that did not include LNA.

Mark Braman, then-CEO of OmegaTech, testified:

-17-

Both OmegaTech and Martek realized the National Academy of Science/Institute of Medicine Report making an authoritative statement identifying a nutrient value for DHA was a lower hurdle (trigger) for achieving the milestone than actually obtaining a DHA nutrient content claim, and agreed that if the Report simply "permitted" the filing of an application (notification) for a [DHA] nutrient content claim, under the FDAMA, then the "Nutrient Content Claim Milestone" would be considered achieved.

\*　　\*　　\*

At no time during the negotiations did the parties discuss or express the idea that a nutrient content claim for [DHA] could be achieved pursuant to the FDAMA without satisfying the "Nutrient Content Claim Milestone".

Finally, the chief negotiator for OmegaTech, Jim Flatt, who later went to work for Martek, testified in deposition:

> Q.    So there would be a benefit to Martek if a nutrient content claim could be obtained for DHA; correct?
>
> A.    Correct.
>
> Q.    And the purpose of the milestone was to reflect that; correct?
>
> 　　　　　\*　　\*　　\*
>
> A.    The purpose of this milestone was to reflect an achievement or a fairly objective and specific achievement, it would represent a step towards the nutrient content claim. Because, again, if you reviewed the milestone, it is based on the National Academy of Sciences making an authoritative statement regarding a very DRI, or dietary reference intake for DHA as specified milligram level that would be sufficient to allow one to apply for a nutrient content claim under FDAMA.
>
> 　　　　So the milestone, in my understanding and the intent at that time, did not reflect the issuance of the nutrient content claim but rather the issuance of a report that would serve as an

-18-

> authoritative statement that would allow for the nutrient content claim to be filed for.

> Q. In other words, under the milestone, a nutrient content claim did not necessarily have to be achieved?

> A. That's correct.

> Q. You simply had to have the prerequisites to obtain a nutrient content claim; correct?

> A. To have one of the princip[al] prerequisites, that's correct.

The remainder of Flatt's deposition suggests that all discussion revolved around what criteria would be required <u>to predict</u> whether the Report was sufficient to permit a nutrient content claim.

All of this testimony supports the position of the OmegaTech stockholders that the specific criteria for the necessary Report existed only to predict when the FDA would allow a nutrient content claim, and that once such a claim had been approved, Martek had received the benefit of the bargain. But there is also at least some evidence that supports Martek's position that the parties bargained for a specific kind of recommendation, rather than simply one that was sufficient to justify a nutrient content claim. Taking the evidence in the light most favorable to the OmegaTech stockholders, however, the evidence would amply support a reasonable factfinder in concluding that the milestone was achieved; that Martek received the benefit of the bargain; and that therefore Martek owes the performance promised under the milestone.

There is therefore a genuine dispute of material fact that should not have been resolved on a motion for summary judgment.

Accordingly, the judgment of the district court is vacated, and the case is remanded for further proceedings.

<u>VACATED AND REMANDED</u>